**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SP PLUS LLC, | |
| Plaintiff, | |
| v. | Case No. |
| JERIES TADROS, | DEMAND FOR JURY TRIAL |
| Defendant. | |

## COMPLAINT

SP Plus LLC ("SP Plus" or the "Company"), by and through its undersigned counsel, hereby brings the following Complaint against Jeries Tadros ("Tadros"), a former SP Plus Regional Manager, seeking monetary damages and injunctive relief based on his: (1) breaches of contract; (2) misappropriation of trade secrets in violation of the federal Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq.*; and, (3) misappropriation of trade secrets in violation of the Illinois Trade Secrets Act, 765 ILCS 1065/1, *et seq*.

## NATURE OF THE CASE

Tadros is a former SP Plus employee who worked for SP Plus primarily in the Chicago, Illinois market, where he provided parking facility management and related services. When he submitted his notice of voluntary resignation in November 2024, Tadros declined to provide information about where he planned to work following his departure from SP Plus. Instead, shortly after his departure from SP Plus, Tadros began working for LAZ Parking ("LAZ"), a direct competitor of SP Plus – a blatant violation of his Agreement Regarding Confidentiality and Non-Competition (the "Agreement") with SP Plus. To make matters worse, and in further

violation of his Agreement, upon information and belief, Tadros has been working in tandem with another former SP Plus employee who is now at LAZ to solicit SP Plus's customers and employees on behalf of their new employer. Tadros's misconduct further constitutes misappropriation of trade secrets in violation of federal and state law, and it also violates the nondisclosure provisions in the Agreement.

## PARTIES

1.      Plaintiff SP Plus is a Delaware limited liability company with its principal place of business in Chicago, Illinois. It is a wholly owned subsidiary of Metropolis Technologies, Inc., which is a Delaware corporation with its principal place of business in Los Angeles, California.

2.      Defendant Tadros is a former Regional Manager I for SP Plus, is an adult citizen of Illinois, and, upon information and belief, resides in Orland Park, Illinois. Upon information and belief, Tadros is currently employed by LAZ as a Senior Business Development Manager – Transportation in the greater Chicago area, which appears to be substantially similar to the role he most recently held at SP Plus.

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this matter involves a cause of action arising under the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836, *et seq.* This Court has supplemental jurisdiction over all state claims brought in this action pursuant to 28 U.S.C. § 1367 because they are so related to the DTSA claim for which this Court has original jurisdiction that they form part of the same controversy.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because Tadros expressly consented to the exclusive jurisdiction of state and federal courts of Chicago,

Illinois in Section 6 of the Agreement. A true and accurate copy of the Agreement is attached hereto as Exhibit 1.

## STATEMENT OF FACTS

### SP Plus's Business, Goodwill, and Confidential Information

5.      SP Plus operates throughout North America and Europe, providing parking facility management and related services. To this end, the Company develops and integrates technology with operations management to create mobility solutions that facilitate the efficient and time-sensitive movement of people, vehicles, and personal travel belongings.

6.      SP Plus offers professional parking management, ground transportation, luggage logistics, facility maintenance, and event logistics.

7.      SP Plus serves a wide range of industries, including aviation, commercial, hospitality, and institutional sectors, providing tailored mobility and logistics solutions. The Company's customers include cities, hotels, universities, hospitals, and airports, with whom SP Plus typically maintains significant, long-term relationships.

8.      SP Plus's Parking Management division oversees all aspects of a customer's parking operations to ensure efficiency, maximize occupancy, and optimize revenue.

9.      SP Plus has a dedicated Hospitality Service group that specializes in serving the hotel industry by managing parking and customer service operations at more than 350 hotels across the United States. The Company provides its hospitality client with valet services, self-parking options, and transportation solutions designed to enhance guest experiences.

10.      Tadros worked primarily in the hospitality industry throughout his employment with SP Plus; he worked with other properties as well, including commercial and residential properties.

11.     LAZ is a direct, head-to-head, major competitor of SP Plus. Indeed, a comparison of the services offered by LAZ, and the customer bases targeted by LAZ, is nearly identical. *Compare* https://www.lazparking.com/our-company/parking-management-services *with* https://www.spplus.com/solutions/ *and* https://www.spplus.com/industries/

12.      As a result of this near-total overlap of competitive services and customers, SP Plus routinely finds itself in direct competition with LAZ for business across SP Plus's offerings and for its customers' business. Based on the many discussions in which Tadros was involved with while at SP Plus (as well as his direct involvement in some of the efforts to win business against LAZ), Tadros is undeniably aware of this directly competitive relationship.

13.     SP Plus expects its Regional Managers and their teams to generate new business, maintain and grow the profitability of its existing business within their assigned regions, sell and increase additional services to existing customers, and ensure customer satisfaction by planning and leading regular meetings to report on finances, operations, ongoing projects, and strategies.

14.     To support employee efforts, SP Plus makes substantial investments in its marketing operations and cultivating leads. Once leads are developed, employees (like Tadros) normally need to engage with a customer many times to close a deal. Pricing is customized and must be assessed on a case-by-case basis, as it may vary according to a variety of factors.

15.     In sum, SP Plus has developed and maintained, at great expense, valuable working relationships and substantial goodwill with its customers. SP Plus has long-standing relationships with its customers and a reasonable expectation that such relationships will continue on a going-forward basis. SP Plus's long-standing customer relationships are of vital importance to its business reputation and success.

16.     The success of SP Plus's business depends on the quality and quantity of its customer base, as well as the associated goodwill and trust that it has built. These factors are all enhanced by SP Plus's trade secrets and other confidential information, which are among SP Plus's most important assets. Examples of such information include, but are not limited to, information about customers and business relationships; contract provisions; pricing; margins; business plans; marketing plans; financial data; business and customer strategy; and plans or proposals related to the foregoing (collectively, "Confidential Information"). Although certain information might be publicly available – such as a customer's name – only a limited number of SP Plus employees know about a particular customer's contact person, needs, preferences, contract pricing, and terms.

17.     Accordingly, SP Plus provides its employees, like Tadros, with access to detailed Confidential Information concerning its customers, including the identity of SP Plus's customer contacts and their contact information, the customers' preferences, needs, buying patterns, specific pricing, margins, discounts and approach to discounts, finance programs, corporate sales strategies, corporate organizational change, and other highly confidential customer information that gives SP Plus a competitive advantage over its competitors with those customers.

18.     Such Confidential Information is a key factor in SP Plus's success and has substantial economic value. Among other things, SP Plus's Confidential Information enables SP Plus to identify, engage, serve, retain, and grow its customers and customer relationships, providing SP Plus with a significant competitive advantage, particularly against direct competitors such as Tadros's new employer, LAZ, who do not have access to SP Plus's Confidential Information.

19.     The disclosure to, or use by, a competitor of such Confidential Information would severely harm SP Plus, including by unfairly undermining its relationships with its customers, and would give SP Plus's competitors like LAZ the ability to solicit and serve its customers better than its competitors could without the Confidential Information.

**SP PLUS'S EXTENSIVE MEASURES TO PROTECT ITS CONFIDENTIAL INFORMATION**

20.     Due to the extremely competitive nature of the parking lot management industry, and in recognition of the importance of protecting its Confidential Information (particularly from a direct competitor like LAZ), SP Plus takes an extensive, multi-layered approach to protect the secrecy of that information and to safeguard and secure access to it.

21.     For example, among other things, SP Plus:

   a.  Requires employees with access to its Confidential Information (including Tadros) to sign agreements containing confidentiality requirements and, in many cases, other restrictive covenants tailored to protect that Confidential Information;

   b.  Trains its employees on the importance of protecting its Confidential Information and requires its employees to adhere to internal policies that protect its Confidential Information, including policies governing the treatment of its Confidential Information, use of its electronic communication and information systems (including phones, computers, email, internet, and social media pages);

   c.  Uses passwords to protect its internal data management systems containing Confidential Information;

   d.  Limits access to its Confidential Information to those employees who need to know the information in order to perform their roles for SP Plus;

e.  Employs policies and provides employee training regarding controlling access to, and maintaining the security of, its Information Technology ("IT") and electronic communications systems; and,

f.  Cuts off departing employees' electronic access to SP Plus's systems at the conclusion of their last day of employment (as was done with respect to Tadros) or on the day of their resignation if they disclose, or SP Plus otherwise learns, that they are going to work for a competitor.

### TADROS'S EMPLOYMENT AND AGREEMENT WITH SP PLUS

22.   Tadros worked for SP Plus and its predecessors since January 2008, most recently as a Regional Manager I in the greater Chicago area.

23.   Throughout his employment at SP Plus and in order to fulfill the obligations of his role as a Regional Manager I, Tadros was repeatedly and extensively exposed to SP Plus's valuable customer relationships and its Confidential Information about SP Plus's current and prospective customers, operations, and strategies.

24.   Accordingly, in connection with his promotion to the Regional Manager I position and in consideration of his continued employment with SP Plus as well as access to SP Plus's Confidential Information, Tadros signed the Agreement on October 1, 2021, which contains certain provisions outlining his restrictive covenants and other post-employment obligations.

25.   In the Agreement, Tadros expressly agreed that he would not

be employed by any entity which is in competition with the Company within a 75 mile radius of any of the Company offices from which Employee worked during the 12 months preceding the termination of Employee's employment with the Company.

Ex. 1, § 3(c).

26.     Pursuant to the terms of the Agreement, Tadros's above noncompete restrictions are in effect for twelve (12) months from the date of his termination (*i.e.*, up to and through December 6, 2025).

27.     Furthermore, Tadros agreed that he would not solicit certain SP Plus customers, stating that

> [D]uring Employee's employment with the Company, and for a period of 12 months thereafter, Employee will not, directly or indirectly, on behalf of Employee or any other person, company or entity, solicit or participate in soliciting any person, company or entity for products or services competitive with or similar to products or services offered by, developed by, designed by or distributed by the Company, if that person, company or entity was a customer or potential customer of the Company for such products or services with which Employee had direct contact or about which Employee learned confidential information related to such products or services at any time during the 12 months preceding the termination of Employee's employment with the Company.

> Ex. 1, § 3(a).

28.     Tadros similarly agreed that he would not directly or indirectly

> offer, provide or sell or participate in offering, providing or selling, products or services competitive with or similar to products or services offered by, developed by, designed by or distributed by the Company to any person, company or entity which was a customer or potential customer of the Company for such products or services and with which Employee had direct contact regarding such products or services at any time during the 12 months preceding the termination of Employee's employment with the Company.

> Ex. 1, § 3(b).

29.     In addition, the Agreement contains an employee nonsolicitation provision, in which Tadros promised that, among other things, "during his employment with the Company and for a period of 12 months thereafter," he would not, directly or indirectly "raid, hire, solicit, or

attempt to persuade any employee…of the Company…to leave the employ of the Company." Ex. 1, § 3(d).

30.     The Agreement also addresses Tadros's obligations to not disclose SP Plus's trade secrets and other confidential or proprietary information. Specifically, Tadros agreed that he would not "directly or indirectly utilize for any purpose other than performance of Employee's employment duties for the Company, or disclose to anyone outside of the Company…any confidential information provided to or obtained by Employee in the course of Employee's employment with the Company or trade secrets of the Company…." *See* Ex. 1, § 1. Tadros agreed that this obligation continues "***during or after Employee's employment with the Company***." *Id.* (emphasis added).

31.     In addition, Tadros agreed that he would, "at any time upon the request of the Company and in any event promptly upon termination of Employee's employment with the Company, but in any event no later than two (2) business days after such termination, deliver all [Company property, including electronically-stored information] to the Company and will not retain any originals or copies of such materials." Ex. 1, § 2.

32.     Moreover, in Section 6 of the Agreement, Tadros agreed that an actual or threatened breach of the above obligations to SP Plus would cause irreparable injury to SP Plus and, therefore, in the event of a violation of the Agreement, in addition to other remedies which may be available, SP Plus is entitled to "temporary restraining orders and preliminary injunctions and final injunctions without the posting of a bond enjoining such breach or threatened breach." *See* Ex. 1, § 6.

33.     Tadros was assigned to service, manage, and grow SP Plus's relationships and business with a substantial group of its hotel customers throughout his employment with SP Plus. Tadros served as the face of SP Plus to these customers.

34.     In order for Tadros to effectively service these customers and expand business opportunities with them, he required and was given access to SP Plus's continuously updated Confidential Information pertaining to these customers, including their identities, contact information, contract terms and pricing, preferences, and other confidential information.

35.     As a Regional Manager I with SP Plus for over sixteen (16) years, Tadros's knowledge of confidential and highly sensitive information regarding SP Plus's operations and finances was both broad and deep. Notably, he was entrusted with access to a multitude of competitive information regarding SP Plus's customers and business strategies on a regional basis, not just the Chicago market with which he had the most customer contact and responsibility.

36.     Tadros was well compensated for his work for SP Plus. In 2023, Tadros earned a base salary that was more than $139,000. In 2024, his base salary increased to approximately $144,000.  His his target annual bonus was more than $10,000.

### TADROS'S MISCONDUCT

37.     In November 2024, and after sixteen (16) years of employment with SP Plus, Tadros submitted his notice of voluntary resignation. When asked about his future plans, Tadros declined to provide SP Plus with any information about where he planned to work following his departure. His last day at SP Plus was December 6, 2024.

38.     Meanwhile, Shevket Dardovski, a former Vice President, Regional Manager III at SP Plus, had resigned from SP Plus and joined LAZ just a few weeks before Tadros's departure.

Mr. Dardovski worked closely and communicated frequently with Tadros while they were employed by SP Plus and, upon information and belief, recruited Tadros to work with him at LAZ. (Indeed, as explained below, it appears that Tadros and Mr. Dardovski also coordinated their efforts to poach SP Plus's employees current and prospective customers on behalf of LAZ, using SP Plus's Confidential Information to do so.)

39.     Tadros followed Mr. Dardovski and began working for LAZ shortly after departing from SP Plus in flagrant violation of his noncompete obligations under the Agreement.

40.     Tadros has violated the Agreement in other ways as well.

41.     Specifically, upon information and belief, Tadros has reached out to at least one SP Plus customer with whom he had direct contact or responsibility and about whom he acquired trade secret or confidential information during his employment with the SP Plus, to solicit their business on behalf of LAZ.

42.     In particular, a long-term SP Plus customer with whom Tadros had regular, direct contact and about whom he knew confidential information, Customer A, canceled its multi-year contract with SP Plus for no apparent reason shortly after Tadros's departure This came as a complete surprise to SP Plus, as Customer A had never raised any concerns or issues with SP Plus.

43.     Although Customer A did not provide a reason for its cancellation, upon information and belief, Tadros and Mr. Dardovski were the impetus for its decision to switch to LAZ. Indeed, upon further information and belief, Mr. Dardovski was bragging at a Super Bowl party about how instrumental he and Tadros were in getting Customer A to move its business from SP Plus to LAZ.

44.     Upon information and belief, Tadros also assisted (and is likely continuing to assist) Mr. Dardovski in soliciting the same prospective customer (Customer B) for LAZ whose business Mr. Dardovski was trying to obtain for SP Plus at the time that he left SP Plus, using the same strategy as he did on behalf of SP Plus and using SP Plus's Confidential Information. By way of background, Mr. Dardovski was trying to obtain Customer B's business for SP Plus at the time that he left SP Plus. Customer B needs approval for a loading zone from the City of Chicago before it enters into any contract for parking management services. While he was at SP Plus, Mr. Dardovski was responsible for working with a particular Chicago Alderman to assist in Customer B's efforts to obtain that approval and, based on his Facebook and LinkedIn posts, Mr. Dardovski continues to be in contact with both Customer B and the Alderman.

45.     SP Plus has learned that Tadros sent a meeting invitation with the subject of "Customer B Proposal" to Mr. Dardovski's personal email address on October 25, 2024 – just days before Mr. Dardovski submitted his notice of voluntary resignation to SP Plus. The proposed meeting time was a date in early November 2024. Upon information and belief, the purpose of this meeting set up by Tadros was to discuss the details of SP Plus's proposal to Customer B and to assist Mr. Dardovski in his efforts to hijack SP Plus's strategy for obtaining business from Customer A in order to win that business for LAZ.

46.     Furthermore, upon information and belief, both Tadros and Mr. Dardovski met for dinner with several SP Plus managers who work on the sites of major SP Plus customers on or about December 4, 2024 – ***before Tadros had left SP Plus*** – for the purpose of soliciting those SP Plus employees on behalf of LAZ and laying the groundwork for future solicitation of the SP Plus customers for which those managers were responsible.

47. In addition to this alarming information about improper solicitation of its customers and employees, Tadros has misappropriated SP Plus's Confidential Information. SP Plus has discovered that, in the weeks leading up to Tadros's and Mr. Dardovski's resignations from SP Plus, Mr. Dardovski sent SP Plus's Confidential Information to Tadros; such information contained confidential client and pricing information. Thereafter, Tadros forwarded the information to his personal email address. Mr. Dardovski had no legitimate, SP Plus-related business reason for sending this detailed information to Tadros, as Tadros was working with another group in the Chicago market at that time and would have had no use for that type of information in his role at SP Plus. However, such information would be extremely valuable to Tadros and Mr. Dardovski in their new roles at LAZ and, in sending it to his personal email address, Tadros clearly intended to provide himself and Mr. Dardovski a head start to directly compete with SP Plus upon joining LAZ.

48. Tadros's efforts to hide his future employment plans from SP Plus, his apparent involvement in Customer A's decision to move its business from SP Plus to LAZ, the timing of his scheduled meeting with Mr. Dardovski about Customer B's proposal, and his suspicious email activity leading up to his departure, all strongly suggest that he intends to disclose and use SP Plus's trade secret and other confidential information in his new role at LAZ, if he has not done so already. For example, Tadros's knowledge about SP Plus's confidential contract terms, including rates and specific services provided, could be used in tailoring proposals for services on behalf of LAZ and to undercut SP Plus's rates.

### SP PLUS REMINDS TADROS OF HIS POST-EMPLOYMENT OBLIGATIONS AND ATTEMPTS TO RESOLVE THE SITUATION WITHOUT RESORTING TO LITIGATION

49. On November 27, 2024 – before Tadros had even separated from SP Plus – Brett Harvey, SP Plus's Vice President, Employee/Labor Relations, sent Tadros a letter via email

reminding him of the scope and importance of his post-employment obligations to SP Plus. Tadros did not respond.

50.     On December 6, 2024, Mr. Harvey sent Tadros a second letter via email after learning some troubling information. In particular, SP Plus informed Tadros that it had discovered that he had started working for LAZ, a direct competitor, in violation of his ongoing obligations to the Company. SP Plus also shared that it was aware that Tadros had sent SP Plus's confidential information from his SP Plus email account to his personal email account. SP Plus demanded that Tadros cease and desist all misconduct and preserve all potentially relevant documents regarding the matter. Tadros ignored SP Plus's second letter as well.

51.     In a final effort to avoid litigation, SP Plus's outside counsel sent a cease-and-desist letter to Tadros on February 20, 2025 demanding that, among other things, Tadros cease performing work on behalf of LAZ, cease soliciting SP Plus customers whom he is restricted from pursuant to the terms of the Agreement, and return all of SP Plus's trade secrets and other confidential information remaining in his personal possession. SP Plus simultaneously sent a copy of the letter to LAZ to seek its cooperation in ensuring that LAZ would not place Tadros in a position to run afoul of his ongoing obligations to SP Plus in the course of his new employment.

52.     While the February 20, 2025, letter prompted LAZ to respond on Tadros's behalf and to reportedly take steps to digitally image Tadros's personal phone and email, Tadros has not indicated any willingness to comply with SP Plus's demands that he cease working on behalf of a direct competitor in violation of the terms of his Agreement and cease soliciting SP Plus customers whom he is restricted from pursuant to the terms of the Agreement. Moreover, Tadros

has not returned any SP Plus information remaining in his personal possession (even though he departed SP Plus four months ago).

53.     In short, the parties have been unable to reach a resolution that adequately addresses SP Plus's concerns. Unfortunately, neither Tadros nor his new employer appear to appreciate the significant present harm and threats of further harm that his brazen and ongoing misconduct poses to SP Plus's customer relationships, its goodwill, and its trade secrets and other confidential information.

54.     As such, SP Plus brings this matter to compensate SP Plus for the losses it has incurred due to Tadros's multiple breaches of the Agreement and misappropriation of SP Plus's trade secrets, and to enjoin Tadros from unfairly competing against SP Plus, soliciting its customers and employees, and using or disclosing any of SP Plus's trade secrets and other confidential information.

## COUNT I

### BREACH OF CONTRACT

55.     SP Plus hereby realleges and incorporates by reference the allegations of the above-numbered paragraphs as if set forth in full herein.

56.     SP Plus and Tadros entered into the Agreement on October 1, 2021.

57.     The Agreement is a valid and enforceable contract between SP Plus and Tadros, and it is supported by adequate consideration in the form of his promotion to a Regional Director I role, his continued employment with SP Plus, and access to SP Plus's trade secrets and other confidential information.

58.     Tadros breached his Agreement by the above-described conduct. Specifically, Tadros agreed that for twelve (12) months following his departure from SP Plus, he would not

15

"be employed by any entity which is in competition with the Company within a 75 mile radius of any Company offices from which Employee worked during the 12 months preceding the termination of Employee's employment with the Company." Ex. 1, § 3(c).

59.     Tadros began working for SP Plus's direct competitor, LAZ, shortly after leaving SP Plus, and LAZ directly competes with SP Plus within 75 miles of the SP Plus office from which he worked during the last year of his employment with SP Plus.

60.     In addition, pursuant to the terms of the Agreement, Tadros agreed that he would not "directly or indirectly… offer, provide or sell or participate in offering, providing or selling, products or services competitive with or similar to products or services offered by, developed by, designed by or distributed by the Company to any person, company or entity which was a customer or potential customer of the Company for such products or services and with which Employee had direct contact regarding such products or services at any time during the 12 months preceding the termination of Employee's employment with the Company." Ex. 1, § 3(b).

61.     Tadros additionally agreed not to solicit certain SP Plus customers: "During Employee's employment with the Company, and for a period of 12 months thereafter, Employee will not, directly or indirectly, on behalf of Employee or any other person, company or entity, solicit or participate in soliciting any person, company or entity for products or services competitive with or similar to products or services offered by, developed by, designed by or distributed by the Company, if that person, company or entity was a customer or potential customer of the Company for such products or services with which Employee had direct contact or about which Employee learned confidential information related to such products or services at any time during the 12 months preceding the termination of Employee's employment with the Company." Ex. 1, § 3(a).

62.     After his departure from SP Plus, Tadros began working for LAZ and, upon information and belief, has violated his duty not to solicit from client or customers with whom he had direct contact or about whom he had learned confidential information related to competitive products or services during his last 12 months of employment with the Company.

63.     While soliciting SP Plus's customers and employees, he has further breached his Agreement with SP Plus by acquiring, inevitably using, and/or disclosing SP Plus's trade secrets and other confidential information beyond the course of his duties for SP Plus, in violation of his nondisclosure obligations. *See* Ex. 1, § 1.

64.     Tadros has additionally breached the Agreement by failing to return the Company's Confidential Information as required, even though he departed SP Plus more than four months ago. *See* Ex. 1, § 2.

65.     SP Plus fully performed its material obligations under the Agreement.

66.     SP Plus has clearly ascertainable rights and protectable interests in its confidential information, its customer goodwill and relationships, and its fair competitive position.

67.     The Agreement, including the noncompete, customer nonsolicitation, employee nonsolicitation, and confidentiality provisions therein, is supported by adequate consideration, and is reasonably necessary and narrowly tailored to protect SP Plus's ascertainable rights and legitimate business interests.

68.     The covenants in the Agreement do not pose an undue hardship on Tadros.

69.     The covenants in the Agreement do not violate any applicable public interest.

70.     As a consequence of the foregoing, SP Plus has suffered and will continue to suffer irreparable harm for which it lacks an adequate remedy at law, as well as present economic loss and other incalculable financial loss.

71.     In his Agreement, Tadros expressly agreed that an actual or threatened breach of the above obligations to SP Plus would cause irreparable damage to SP Plus and, therefore, in the event of a violation of the Agreement, in addition to other remedies which may be available, SP Plus is entitled to "temporary restraining orders and preliminary injunctions and final injunctions without the posting of a bond enjoining such breach or threatened breach." *See* Ex. 1, § 6.

72.     Unless Tadros is enjoined from the foregoing conduct, SP Plus will be irreparably harmed by:

a.  Disclosure and/or use of SP Plus's trade secret information, and other confidential information that is solely the property of SP Plus; and,

b.  Present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable, but in no event less than $75,000 exclusive of interest and costs.

## COUNT II

### MISAPPROPRIATION OF TRADE SECRETS
### IN VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. §§ 1836, *ET SEQ.*

73.     SP Plus hereby realleges and incorporates by reference the allegations of the above-numbered paragraphs as if set forth in full herein.

74.     During the entire course of his employment with SP Plus, Tadros had access to trade secrets and other nonpublic confidential information that is of extraordinary value to SP Plus.

75.     As set forth above, SP Plus expended significant amounts of time and money to develop, accumulate, maintain, refine, and possess certain trade secret information, including, but not limited to, information about customers and business relationships; contract provisions; pricing; margins; business plans; marketing plans; financial data; business and customer strategy;

and plans or proposals related to the foregoing. This information constitutes "trade secrets" under the DTSA.

76.     SP Plus has made concerted efforts and reasonable steps to maintain the secrecy of its trade secrets and to prevent the unauthorized disclosure or use of its trade secret information through, among other measures, requiring employees with access to its trade secrets and other confidential information to sign agreements containing confidentiality requirements and, in many other cases, other restrictive covenants tailored to protect that information; training its employees on the importance of protecting its trade secrets and other confidential information and requiring its employees to adhere to internal policies that protect such information, including policies governing the treatment of its trade secrets and other confidential information, use of its electronic communication and information systems (including phones, computers, email, internet, and social media pages); using passwords to protect its internal data management systems containing trade secrets and other confidential information; limiting access to its trade secrets and other confidential information to those employees who need to know the information in order to perform their roles for SP Plus; employing policies and providing employee training regarding controlling access to, and maintaining the security of, its Information Technology ("IT") and electronic communications systems; and, cutting off departing employees' electronic access to SP Plus's systems at the conclusion of their last day of employment or on the day of their resignation if they disclose, or SP Plus otherwise learns, that they are going to work for a competitor.

77.     SP Plus's trade secrets derive independent economic value and confer a competitive edge to SP Plus from not being generally known to, and not being readily ascertainable by proper means by, other companies or individuals (in SP Plus's industry or

elsewhere) who could obtain an advantage from them by virtue of their not being accessible, through proper means, to competitors who could profit from their use or disclosure. SP Plus provided Tadros access to its trade secret information for the limited purpose of his use of this information during the scope of his employment for SP Plus.

78.     These trade secrets are used in interstate commerce by SP Plus in its businesses within the United States.

79.     Tadros acquired SP Plus's trade secret information by improper means when he abused his access to such information and transferred it to his personal email account for no legitimate (SP Plus-related) business purpose, violated the confidentiality provisions within the Agreement, violated various SP Plus policies, wrongfully misappropriated, and then retained such information following the termination of his employment with SP Plus.

80.     Tadros's misappropriation of SP Plus's trade secrets has been willful and malicious in that he was aware of his contractual obligations to maintain the confidentiality of SP Plus's trade secrets, yet he violated those obligations when he obtained and transferred them to his personal email account. As further evidence that his misappropriation was willful and malicious, Tadros lied about his future employment plans with LAZ to avoid detection by SP Plus.

81.      Tadros's misconduct was not only a violation of the Agreement and common law, but also constitutes a willful and malicious misappropriation of SP Plus's trade secrets in violation of the DTSA.

82.     Unless enjoined by this Court, Tadros's misappropriation of SP Plus's trade secrets will cause significant irreparable harm to SP Plus, and SP Plus has no adequate or other remedy at law for such acts and threatened acts. As such, SP Plus is entitled to injunctive relief.

83.     As a direct, proximate, and foreseeable result of Tadros's misappropriation of SP Plus's trade secrets, SP Plus has also been monetarily damaged in an amount to be determined at trial.

## COUNT III

### MISAPPROPRIATION OF TRADE SECRETS
### IN VIOLATION OF THE ILLINOIS TRADE SECRETS ACT, 765 ILCS 1065/1, *ET SEQ.*

84.     SP Plus hereby realleges and incorporates by reference the allegations of the above-numbered paragraphs as if set forth in full herein.

85.     At all relevant times, the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1, *et seq.*, was in effect.

86.     SP Plus owned and developed trade secrets as defined by 765 ILCS 1065/2(d).

87.     SP Plus's confidential information described above constitutes trade secrets because SP Plus derives independent economic value and a competitive edge from that information not being generally known to the public and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and because the information was the subject of reasonable efforts to maintain its secrecy.

88.     SP Plus invested substantial time, money, and effort to develop, accumulate, maintain, refine, its trade secret information. SP Plus has made concerted efforts and taken reasonable steps to maintain the secrecy of its trade secrets and to prevent the unauthorized disclosure or use of its trade secret information. As described in greater detail above, SP Plus, among other things, maintains its trade secret information on password-protected computers, limits access to the information, mandates that employees follow its confidentiality policies, and requires employees to sign agreements containing confidentiality requirements and, in many other cases, other restrictive covenants tailored to protect that information.

89.     Pursuant to 765 ILCS 1065/2, a person who misappropriates the trade secret of another person by improper means or discloses the trade secret without the express or implied consent of the person or who used improper means to acquire the knowledge of the trade secret(s) violates the ITSA.

90.     The above-alleged facts constitute threatened misappropriation of trade secrets by Tadros pursuant to the ITSA, and applicable common law.

91.     Tadros's knowledge of  SP Plus's trade secret information was acquired under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty Tadros owed SP Plus both contractually and as an employee of SP Plus.

92.     Tadros made improper use of SP Plus's trade secret information when he transferred it to his personal email account for no legitimate (SP Plus-related) business purpose.

93.     Tadros's misappropriation of SP Plus's trade secrets has been willful and malicious in that he was aware of his contractual obligations to maintain the confidentiality of SP Plus's trade secrets, yet he violated those obligations when he obtained and transferred them to his personal email account. As further evidence that his misappropriation was willful and malicious, Tadros lied about his future employment plans with LAZ to avoid detection by SP Plus.

94.     Tadros will be unjustly enriched by the misappropriation of SP Plus's trade secrets, and unless restrained, will continue to use, divulge, and otherwise misappropriate SP Plus's trade secrets.

95.     SP Plus has been injured, irreparably and otherwise, and is threatened with additional and ongoing injuries as a result of Tadros's misappropriation of trade secrets.

96.     Tadros has used or disclosed and may continue to use or disclose SP Plus's trade secrets and confidential and proprietary information, in violation of Illinois law and his duties to SP Plus. This disclosure and use have and will continue to wrongfully benefit Tadros and LAZ to the detriment of SP Plus. Tadros's unauthorized, wrongful, and tortious conduct has directly and proximately caused great and irreparable injury to SP Plus which cannot be adequately measured or compensated by money damages.

97.     SP Plus has no adequate remedy at law and is entitled to equitable and injunctive relief.

98.     SP Plus has suffered damages as a result of these actions in an amount to be determined at trial, and because its remedy at law is inadequate, SP Plus seeks injunctive relief to protect its trade secret information, its goodwill and other legitimate business interests. SP Plus also seeks to recover from Tadros any gains, profits and advantages obtained as a result of the wrongful acts alleged herein in an amount to be determined and an award of exemplary damages and attorneys' fees as permitted by law.

## JURY DEMAND

SP Plus demands a trial by jury on all issues and causes of action so triable.

## ATTORNEYS' FEES AND COSTS

SP Plus seeks reasonable attorneys' fees and costs against Tadros under the DTSA and ITSA.

## PRAYER FOR RELIEF

WHEREFORE, for relief on each of its causes of action, SP Plus respectfully requests that the Court enter an order and judgment in its favor as follows:

a. Judgment in SP Plus's favor and against Defendant Tadros on all causes of action alleged herein;

b. Monetary damages in an amount to be proven at trial, but far in excess of $75,000;

c. Exemplary and punitive damages for Defendant Tadros's willful and malicious actions;

d. SP Plus's attorneys' fees and costs;

e. Pre-judgment and post-judgment interest at the maximum rate allowed by law;

f. Entering injunctive relief prohibiting Tadros from transmitting, disclosing, and/or using any of SP Plus's trade secrets and other confidential information;

g. Entering injunctive relief requiring Tadros to return to SP Plus any trade secrets and other confidential information that he currently possesses, regardless of the format in which it is stored;

h. Entering injunctive relief prohibiting Tadros from being employed by, or performing work on behalf of, any entity which is in competition with SP Plus within a 75-mile radius of any of the SP Plus offices from which he worked during the 12 months preceding December 6, 2024, running for 12 months from the date that Tadros is no longer in breach of the noncompete provisions of the Agreement;

i. Entering injunctive relief prohibiting Tadros, and those acting in concert with him, from (i) directly or indirectly soliciting, or participating in soliciting any person, company or entity for products or services competitive with or similar to products or services offered by, developed by, designed by or distributed by SP

Plus, if that person, company or entity was a customer or potential customer of SP Plus for such products or services and with which Tadros had direct contact or about which he learned confidential information related to such products or services at any time during the 12 months preceding December 6, 2024, and from (ii) directly or indirectly providing or selling or participating in offering, providing or selling, products or services competitive with or similar to products or services offered by, developed by, designed by or distributed by SP Plus to any person, company or entity which was a customer or potential customer of SP Plus for such products or services and with which Tadros had direct contact regarding such products or services at any time during the 12 months preceding December 6, 2024, running for 12 months from the date that Tadros is no longer in breach of the customer nonsolicit provisions of the Tadros Agreement;

j. Entering injunctive relief prohibiting Tadros from: (i) directly or indirectly raiding, hiring, soliciting, or attempting to persuade any employee or temporary employee of SP Plus who was an employee of SP during the 12 months preceding December 6, 2024, who possesses confidential information of SP Plus, to leave the employ of SP Plus; (ii) interfering with the performance by any such persons of their duties for SP Plus; or, (iii) communicating with any such persons for the purposes described in items (i) and (ii); and

k. Granting such other and further relief as the Court deems just and proper.

25

Dated:  May 23, 2025

Respectfully submitted,

SP PLUS LLC,

By its attorneys,

*/s/ Timothy D. Elliott*

Timothy D. Elliott ARDC 6237023
Raymond J. Sanguinetti ARDC 6244798
RATHJE WOODWARD LLC
300 E. Roosevelt Road, Suite 220
Wheaton, Illinois 60187
Phone: (630) 510-4910
Fax: (630) 668-9218
*telliott@rathjelaw.com*
*rsanguinetti@rathjelaw.com*

Stephen D. Riden, MA BBO No. 644451
 *sriden@beckreed.com*
BECK REED RIDEN LLP
155 Federal Street, Suite 1302
Boston, Massachusetts 02110
Phone: (617) 500-8660
Fax: (617) 500-8665
*Pro Hac Vice Application Forthcoming*