## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| SP PLUS LLC, | |
| Plaintiff, | |
| v. | Case No. 1:25-cv-05825 |
| JERIES TADROS, | **DEMAND FOR JURY TRIAL BY PLAINTIFF AND DEFENDANT** |
| Defendant. | |

### DEFENDANT JERIES TADROS'S
### ANSWER AND AFFIRMATIVE DEFENSES TO COMPLAINT

Defendant Jeries Tadros ("Tadros" or "Defendant"), by and through his undersigned counsel, hereby submits the following Answer and Affirmative Defenses to the Complaint filed by his former employer, Plaintiff SP Plus, LLC ("SP Plus" or "Plaintiff").

### NATURE OF THE CASE

*Tadros is a former SP Plus employee who worked for SP Plus primarily in the Chicago, Illinois market, where he provided parking facility management and related services. When he submitted his notice of voluntary resignation in November 2024, Tadros declined to provide information about where he planned to work following his departure from SP Plus. Instead, shortly after his departure from SP Plus, Tadros began working for LAZ Parking ("LAZ"), a direct competitor of SP Plus – a blatant violation of his Agreement Regarding Confidentiality and Non-Competition (the "Agreement") with SP Plus. To make matters worse, and in further violation of his Agreement, upon information and belief, Tadros has been working in tandem with another former SP Plus employee who is now at LAZ to solicit SP Plus's customers and employees on behalf of their new employer. Tadros's misconduct further constitutes misappropriation of trade secrets in violation of federal and state law, and it also violates the nondisclosure provisions in the Agreement.*

ANSWER:    This paragraph is an introductory paragraph to which no response is required. To the extent a response is required, Tadros admits only that he was formerly employed by SP Plus providing parking facility management and related services in the Chicago market, that he submitted his two weeks' notice of voluntary resignation from SP Plus on November 22, 2024, that Tadros did not provide information to SP Plus at the time regarding his employment plans

1

after SP Plus as he had no obligation to do so, and that on December 9, 2024, Tadros started working for LAZ Parking Services, LLC ("LAZ") developing new shuttle bus/transportation business at locations exclusively outside of Illinois in compliance with any and all arguably enforceable post-employment restrictions in his SP Plus Agreement. Tadros denies the remaining allegations in this paragraph of the Complaint.

## **PARTIES**

1.      *Plaintiff SP Plus is a Delaware limited liability company with its principal place of business in Chicago, Illinois. It is a wholly owned subsidiary of Metropolis Technologies, Inc., which is a Delaware corporation with its principal place of business in Los Angeles, California.*

ANSWER:      Tadros is without knowledge sufficient to form a belief about the truth of the allegations contained in this paragraph and on that basis denies the same.

2.      *Defendant Tadros is a former Regional Manager I for SP Plus, is an adult citizen of Illinois, and, upon information and belief, resides in Orland Park, Illinois. Upon information and belief, Tadros is currently employed by LAZ as a Senior Business Development Manager – Transportation in the greater Chicago area, which appears to be substantially similar to the role he most recently held at SP Plus.*

ANSWER:      Tadros admits only that he is a former Regional Manager I for SP Plus, that he is an adult citizen of Illinois who resides in Orland Park, Illinois, and he is currently employed by LAZ as a Senior Business Development Manager – Transportation working on developing business at customers and locations exclusively outside of Illinois. Tadros denies the remaining allegations in Paragraph 2.

3.      *This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this matter involves a cause of action arising under the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836, et seq. This Court has supplemental jurisdiction over all state claims brought in this action pursuant to 28 U.S.C. § 1367 because they are so related to the DTSA claim for which this Court has original jurisdiction that they form part of the same controversy.*

ANSWER:      Paragraph 3 states legal conclusions to which no answer is required. To the extent an answer is required, Tadros does not contest this Court has proper jurisdiction over SP Plus's claims in the Complaint under the DTSA and supplemental jurisdiction over Plaintiff's state

law claims. Tadros denies that SP Plus's claims have merit and denies that SP Plus is entitled to any relief against him on the bases set forth in the Complaint or on any other basis. Tadros denies any remaining allegations in Paragraph 3.

4.      *Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because Tadros expressly consented to the exclusive jurisdiction of state and federal courts of Chicago, Illinois in Section 6 of the Agreement. A true and accurate copy of the Agreement is attached hereto as* <u>*Exhibit 1*</u>.

ANSWER: Paragraph 4 states a legal conclusion to which no answer is required. To the extent an answer is required, Tadros does not contest this Court is a proper venue for SP Plus's claims. Tadros denies that SP Plus's claims have merit and denies that SP Plus is entitled to any relief against him on the bases set forth in the Complaint or on any other basis. Further, the document attached to the Complaint as Exhibit 1 is a document that speaks for itself. Tadros denies any remaining allegations in Paragraph 4.

## STATEMENT OF FACTS

## SP PLUS'S BUSINESS, GOODWILL, AND CONFIDENTIAL INFORMATION

5.      *SP Plus operates throughout North America and Europe, providing parking facility management and related services. To this end, the Company develops and integrates technology with operations management to create mobility solutions that facilitate the efficient and time-sensitive movement of people, vehicles, and personal travel belongings.*

ANSWER:      Tadros admits only that he believes SP Plus operates throughout North America and Europe, although Tadros only ever worked for SP Plus in the Chicago market. Tadros is without knowledge sufficient to form a belief about the scope of the services SP Plus currently provides to its clients and on that basis denies the remaining allegations in Paragraph 5.

6.      *SP Plus offers professional parking management, ground transportation, luggage logistics, facility maintenance, and event logistics.*

ANSWER:      Tadros admits only that during his prior employment with SP Plus he worked in providing parking management and related services to customers in Chicago. Tadros is

without knowledge sufficient to form a belief about the scope of the services SP Plus currently provides to its clients, and on that basis Tadros denies the remaining allegations in Paragraph 6 of the Complaint.

7. *SP Plus serves a wide range of industries, including aviation, commercial, hospitality, and institutional sectors, providing tailored mobility and logistics solutions. The Company's customers include cities, hotels, universities, hospitals, and airports, with whom SP Plus typically maintains significant, long-term relationships.*

ANSWER: Tadros admits only that in his experience working for SP Plus in Chicago he is aware that SP Plus provides parking management and related services to a variety of customers, and that typically contracts are terminable by the customer on thirty-days' notice and/or may from time to time be subjected to a multi-party competitive bid process. Answering further, Tadros is without knowledge sufficient to form a belief about the full scope of the services SP Plus currently provides to its clients, and on that basis Tadros denies the remaining allegations in Paragraph 7.

8. *SP Plus's Parking Management division oversees all aspects of a customer's parking operations to ensure efficiency, maximize occupancy, and optimize revenue.*

ANSWER: Tadros is without knowledge sufficient to form a belief about all aspects of the parking and related services SP Plus currently provides to its clients, and on that basis Tadros denies the allegations in Paragraph 8.

9. *SP Plus has a dedicated Hospitality Service group that specializes in serving the hotel industry by managing parking and customer service operations at more than 350 hotels across the United States. The Company provides its hospitality client with valet services, self-parking options, and transportation solutions designed to enhance guest experiences.*

ANSWER: Tadros admits only that he is aware that during the time he worked for SP Plus in the Chicago market SP Plus had a hospitality group, in which Tadros worked from approximately 2008 to 2021, and that within this group in Chicago SP Plus managed parking operations at hotels in Chicago. Tadros is without knowledge sufficient to form a belief about the

4

scope of the services SP Plus currently provides to its clients in Chicago or across the United States, and on that basis Tadros denies the remaining allegations in Paragraph 9.

*10. Tadros worked primarily in the hospitality industry throughout his employment with SP Plus; he worked with other properties as well, including commercial and residential properties.*

ANSWER: Tadros admits only that during his employment with SP Plus in Chicago he provided parking management services for some Chicago hotel clients as well as some commercial and residential properties in Chicago. Tadros denies any remaining allegations in Paragraph 10.

*11. LAZ is a direct, head-to-head, major competitor of SP Plus. Indeed, a comparison of the services offered by LAZ, and the customer bases targeted by LAZ, is nearly identical. Compare https://www.lazparking.com/our-company/parking-management-services with https://www.spplus.com/solutions/ and https://www.spplus.com/industries/*

ANSWER: Tadros admits only that LAZ and SP Plus are national competitors that offer similar services to customers and potential customers. The websites referenced in Paragraph 11 are self-explanatory. Tadros denies any remaining allegations in Paragraph 11.

*12. As a result of this near-total overlap of competitive services and customers, SP Plus routinely finds itself in direct competition with LAZ for business across SP Plus's offerings and for its customers' business. Based on the many discussions in which Tadros was involved with while at SP Plus (as well as his direct involvement in some of the efforts to win business against LAZ), Tadros is undeniably aware of this directly competitive relationship.*

ANSWER: Tadros admits that LAZ and SP Plus are national competitors, and he is aware the two companies compete directly with one another in the Chicago market as well as in other markets around the country. Stating further, all of Tadros's work at SP Plus was for customers in Chicago, while all of Tadros's work at LAZ has been for customers outside of Illinois. Tadros denies any remaining allegations in Paragraph 12.

*13. SP Plus expects its Regional Managers and their teams to generate new business, maintain and grow the profitability of its existing business within their assigned regions, sell and increase additional services to existing customers, and ensure customer satisfaction by planning and leading regular meetings to report on finances, operations, ongoing projects, and strategies.*

ANSWER:    Tadros is without knowledge sufficient to form a belief about SP Plus's current expectations for its Regional Managers and their teams, and on that basis denies the allegations in Paragraph 13.

14.    *To support employee efforts, SP Plus makes substantial investments in its marketing operations and cultivating leads. Once leads are developed, employees (like Tadros) normally need to engage with a customer many times to close a deal. Pricing is customized and must be assessed on a case-by-case basis, as it may vary according to a variety of factors.*

ANSWER: Tadros admits only that during his employment with SP Plus he had regular contact with Chicago customers to whom he was assigned. Stating further, Tadros is without knowledge sufficient to form a belief about SP Plus's level of investments in its marketing operations and cultivating leads, or its customized pricing, and on that basis denies the remaining allegations in Paragraph 14.

15.    *In sum, SP Plus has developed and maintained, at great expense, valuable working relationships and substantial goodwill with its customers. SP Plus has long-standing relationships with its customers and a reasonable expectation that such relationships will continue on a going-forward basis. SP Plus's long-standing customer relationships are of vital importance to its business reputation and success.*

ANSWER:    Tadros is without knowledge sufficient to form a belief about SP Plus's general efforts and level of expense to develop and maintain relationships with customers, and on that basis denies those allegations in Paragraph 15. Tadros also denies that SP Plus's client relationships in Chicago where he worked are generally so stable and long-term that SP Plus has "a reasonable expectation that such relationships will continue on a going-forward basis." Answering further, Tadros states that in his experience working for SP Plus the parking management services business in Chicago is highly competitive, with customer contracts generally terminable on 30-days' notice and locations also being put out by the owner or management company to a competitive, multi-party bid process. In Tadros's experience at SP Plus, it was not uncommon for customers to change parking management providers, including changing between

SP Plus and LAZ or one of the other parking management companies operating in Chicago. On this basis, Tadros denies any remaining allegations in Paragraph 15.

16.     *The success of SP Plus's business depends on the quality and quantity of its customer base, as well as the associated goodwill and trust that it has built. These factors are all enhanced by SP Plus's trade secrets and other confidential information, which are among SP Plus's most important assets. Examples of such information include, but are not limited to, information about customers and business relationships; contract provisions; pricing; margins; business plans; marketing plans; financial data; business and customer strategy; and plans or proposals related to the foregoing (collectively, "Confidential Information"). Although certain information might be publicly available – such as a customer's name – only a limited number of SP Plus employees know about a particular customer's contact person, needs, preferences, contract pricing, and terms.*

ANSWER:     The allegations in Paragraph 16 contain legal conclusions as to what may constitute SP Plus's protectable "trade secrets" under the DTSA and Illinois Trade Secrets Act ("ITSA") to which no response is required. To the extent a response is required, Tadros denies the legal conclusion allegations that each-and-every of the cited general categories of information listed in Paragraph 16 constitute trade secrets and denies any remaining factual allegations in the Paragraph.

17.     *Accordingly, SP Plus provides its employees, like Tadros, with access to detailed Confidential Information concerning its customers, including the identity of SP Plus's customer contacts and their contact information, the customers' preferences, needs, buying patterns, specific pricing, margins, discounts and approach to discounts, finance programs, corporate sales strategies, corporate organizational change, and other highly confidential customer information that gives SP Plus a competitive advantage over its competitors with those customers.*

ANSWER:     Tadros admits only that while employed with SP Plus he had access to and used certain of SP Plus's non-public information for customers and/or potential customers in Chicago to whom Tadros was assigned responsibility, and that, depending on the customer and Tadros's assigned role, some of the non-public information shared with or gathered by Tadros may have included information of the type listed in Paragraph 17. Tadros is without sufficient knowledge of what information SP Plus provides its employees today or provides to employees outside of Chicago and lacks knowledge sufficient to answer as to SP Plus's alleged "competitive

advantage over its competitors" provided by this information, and on that basis denies the same along with any remaining allegations in Paragraph 17.

18.     *Such Confidential Information is a key factor in SP Plus's success and has substantial economic value. Among other things, SP Plus's Confidential Information enables SP Plus to identify, engage, serve, retain, and grow its customers and customer relationships, providing SP Plus with a significant competitive advantage, particularly against direct competitors such as Tadros's new employer, LAZ, who do not have access to SP Plus's Confidential Information.*

ANSWER:     Tadros is without sufficient knowledge to form a belief as to whether "[s]uch Confidential Information is a key factor in SP Plus's success" and/or provides SP Plus "with a significant competitive advantage," and on that basis Tadros denies these allegations. Answering further, Tadros states the parking management services business in the Chicago market is highly competitive, such that in Tadros's experience everyone generally knows everyone else, and most of the competitors, including SP Plus and LAZ and other operators in Chicago, often have their own longstanding relationships with the same customer contacts, who also may move between different customers in the city from time to time. Tadros denies any remaining allegations in Paragraph 18.

19.     *The disclosure to, or use by, a competitor of such Confidential Information would severely harm SP Plus, including by unfairly undermining its relationships with its customers, and would give SP Plus's competitors like LAZ the ability to solicit and serve its customers better than its competitors could without the Confidential Information.*

ANSWER:     The allegations in Paragraph 19 are alleged as a hypothetical and therefore no response is required. To the extent a response is required, Tadros denies the general categories of information identified as "Confidential Information" are legally protectable. Tadros is without knowledge sufficient to form a belief as to the consequences of any of SP Plus's competitors using information described in the Complaint as "Confidential Information," and on that basis denies the same. Tadros denies any remaining allegations in Paragraph 19.

## SP PLUS'S EXTENSIVE MEASURES TO PROTECT ITS CONFIDENTIAL INFORMATION

20.     *Due to the extremely competitive nature of the parking lot management industry, and in recognition of the importance of protecting its Confidential Information (particularly from a direct competitor like LAZ), SP Plus takes an extensive, multi-layered approach to protect the secrecy of that information and to safeguard and secure access to it.*

ANSWER: Tadros is without knowledge sufficient to form a belief as to SP Plus's "extensive, multi-layered approach to protect secrecy" and safeguard the broadly referenced categories of alleged "Confidential Information," and on that basis denies the allegations in Paragraph 20.

21.     *For example, among other things, SP Plus:*

a.     *Requires employees with access to its Confidential Information (including Tadros) to sign agreements containing confidentiality requirements and, in many cases, other restrictive covenants tailored to protect that Confidential Information;*

b.     *Trains its employees on the importance of protecting its Confidential Information and requires its employees to adhere to internal policies that protect its Confidential Information, including policies governing the treatment of its Confidential Information, use of its electronic communication and information systems (including phones, computers, email, internet, and social media pages);*

c.     *Uses passwords to protect its internal data management systems containing Confidential Information;*

d.     *Limits access to its Confidential Information to those employees who need to know the information in order to perform their roles for SP Plus;*

e.     *Employs policies and provides employee training regarding controlling access to, and maintaining the security of, its Information Technology ("IT") and electronic communications systems; and,*

f.     *Cuts off departing employees' electronic access to SP Plus's systems at the conclusion of their last day of employment (as was done with respect to Tadros) or on the day of their resignation if they disclose, or SP Plus otherwise learns, that they are going to work for a competitor.*

ANSWER:     Tadros admits only that in the course of his employment with SP Plus he signed an agreement attached to the Complaint as Exhibit 1, which, in part, addresses the non-disclosure or use of SP Plus's confidential information. Tadros is without knowledge sufficient to

9

form a belief about the remaining allegations in Paragraph 14 and on that basis Tadros denies the remaining allegations set forth in subparagraphs (a)–(f).

<u>TADROS'S EMPLOYMENT AND AGREEMENT WITH SP PLUS</u>

*22.    Tadros worked for SP Plus and its predecessors since January 2008, most recently as a Regional Manager I in the greater Chicago area.*

ANSWER:    Tadros admits only that he worked for SP Plus from January 2008 until November 22, 2024, that his most recent title while working for SP Plus was Regional Manager I, and that for the entirety of his employment with SP Plus Tadros worked on and for customer locations in Chicago. Tadros denies any remaining allegations in Paragraph 22.

*23.    Throughout his employment at SP Plus and in order to fulfill the obligations of his role as a Regional Manager I, Tadros was repeatedly and extensively exposed to SP Plus's valuable customer relationships and its Confidential Information about SP Plus's current and prospective customers, operations, and strategies.*

ANSWER:    Tadros admits only that, during his employment with SP Plus, he had regular access to non-public information belonging to SP Plus, including information about customers and prospective customers in Chicago. Tadros denies any remaining allegations in Paragraph 23.

*24.    Accordingly, in connection with his promotion to the Regional Manager I position and in consideration of his continued employment with SP Plus as well as access to SP Plus's Confidential Information, Tadros signed the Agreement on October 1, 2021, which contains certain provisions outlining his restrictive covenants and other post-employment obligations.*

ANSWER:    Tadros admits only that on or about October 1, 2021, at about the time he was promoted to Regional Manager I, Tadros was presented with and signed the SP Plus Agreement that is attached as Exhibit 1 to the Complaint. Tadros denies any remaining allegations in Paragraph 24.

*25.    In the Agreement, Tadros expressly agreed that he would not be employed by any entity which is in competition with the Company within a 75 mile radius of any of the Company offices from which Employee worked during the 12 months preceding the termination of Employee's employment with the Company. Ex. 1, § 3(c).*

ANSWER:   The Agreement referenced in Paragraph 25 (and attached to the Complaint as Exhibit 1) speaks for itself, therefore, so no response is required. To the extent a response is required, Tadros denies any characterization by Plaintiff about the nature of the obligations set out the Agreement and, instead, refers to the plain text of the Agreement.

26.   *Pursuant to the terms of the Agreement, Tadros's above noncompete restrictions are in effect for twelve (12) months from the date of his termination (i.e., up to and through December 6, 2025).*

ANSWER:   The Agreement referenced in Paragraph 26 (and attached to the Complaint as Exhibit 1) speaks for itself, therefore, no response is required. To the extent a response is required, Tadros refers to the plain text of the Agreement and denies any characterization by Plaintiff about the nature of the obligations set out in the Agreement, including denying that Tadros's "noncompete restrictions," if and to the extent enforceable at all, remain in effect "up to and through December 6, 2025," when Plaintiff decided that Tadros's last day worked for SP Plus was November 25, 2024. Tadros denies any remaining allegations in Paragraph 26

27.   *Furthermore, Tadros agreed that he would not solicit certain SP Plus customers, stating that [D]uring Employee's employment with the Company, and for a period of 12 months thereafter, Employee will not, directly or indirectly, on behalf of Employee or any other person, company or entity, solicit or participate in soliciting any person, company or entity for products or services competitive with or similar to products or services offered by, developed by, designed by or distributed by the Company, if that person, company or entity was a customer or potential customer of the Company for such products or services with which Employee had direct contact or about which Employee learned confidential information related to such products or services at any time during the 12 months preceding the termination of Employee's employment with the Company. Ex. 1, § 3(a).*

ANSWER:   The Agreement referenced in Paragraph 27 (and attached to the Complaint as Exhibit 1) speaks for itself, therefore, no response is required. To the extent a response is required, Tadros refers to the plain text of the Agreement and denies any characterization by Plaintiff about the nature of the obligations set out in the Agreement. Tadros denies any remaining allegations in Paragraph 27

28.     *Tadros similarly agreed that he would not directly or indirectly offer, provide or sell or participate in offering, providing or selling, products or services competitive with or similar to products or services offered by, developed by, designed by or distributed by the Company to any person, company or entity which was a customer or potential customer of the Company for such products or services and with which Employee had direct contact regarding such products or services at any time during the 12 months preceding the termination of Employee's employment with the Company.* Ex. 1, § 3(b).

ANSWER:     The Agreement referenced in Paragraph 28 (and attached to the Complaint as Exhibit 1) speaks for itself, therefore, no response is required. To the extent a response is required, Tadros refers to the plain text of the Agreement and denies any characterization by Plaintiff about the nature of the obligations set out in the Agreement. Tadros denies any remaining allegations in Paragraph 28.

29.     *In addition, the Agreement contains an employee nonsolicitation provision, in which Tadros promised that, among other things, "during his employment with the Company and for a period of 12 months thereafter," he would not, directly or indirectly "raid, hire, solicit, or attempt to persuade any employee...of the Company...to leave the employ of the Company."* Ex. 1, § 3(d).

ANSWER:     The Agreement referenced in Paragraph 29 (and attached to the Complaint as Exhibit 1) speaks for itself, therefore, no response is required. To the extent a response is required, Tadros refers to the plain text of the Agreement and denies any characterization by Plaintiff about the nature of the obligations set out in the Agreement. Tadros denies any remaining allegations in Paragraph 29.

30.     *The Agreement also addresses Tadros's obligations to not disclose SP Plus's trade secrets and other confidential or proprietary information. Specifically, Tadros agreed that he would not "directly or indirectly utilize for any purpose other than performance of Employee's employment duties for the Company, or disclose to anyone outside of the Company...any confidential information provided to or obtained by Employee in the course of Employee's employment with the Company or trade secrets of the Company...." See Ex. 1, § 1. Tadros agreed that this obligation continues "during or after Employee's employment with the Company." Id. (emphasis added).*

ANSWER:     The Agreement referenced in Paragraph 30 (and attached to the Complaint as Exhibit 1) speaks for itself, therefore, no response is required. To the extent a response is required, Tadros refers to the plain text of the Agreement and denies any characterization by

12

Plaintiff about the nature of the obligations set out in the Agreement. Tadros denies any remaining allegations in Paragraph 30.

*31.     In addition, Tadros agreed that he would, "at any time upon the request of the Company and in any event promptly upon termination of Employee's employment with the Company, but in any event no later than two (2) business days after such termination, deliver all [Company property, including electronically-stored information] to the Company and will not retain any originals or copies of such materials." Ex. 1, § 2.*

ANSWER:     The Agreement referenced in Paragraph 31 (and attached to the Complaint as Exhibit 1) speaks for itself, therefore, no response is required. To the extent a response is required, Tadros refers to the plain text of the Agreement and denies any characterization by Plaintiff about the nature of the obligations set out in the Agreement. Tadros denies any remaining allegations in Paragraph 31. Answering further, Tadros states that he has since at least December 6, 2024, offered to return and permanently delete any SP Plus property remaining in his possession or control, and requested that SP Plus provide him with instruction as to how Plaintiff would like Tadros to proceed. Rather than respond with instructions, SP Plus has elected to allege, months later and in bad faith that Tadros has refused to return SP Plus's property when Plaintiff knows that Tadros has continued to act in accordance with SP Plus's own preservation letter.

*32.     Moreover, in Section 6 of the Agreement, Tadros agreed that an actual or threatened breach of the above obligations to SP Plus would cause irreparable injury to SP Plus and, therefore, in the event of a violation of the Agreement, in addition to other remedies which may be available, SP Plus is entitled to "temporary restraining orders and preliminary injunctions and final injunctions without the posting of a bond enjoining such breach or threatened breach." See Ex. 1, § 6.*

ANSWER:     The Agreement referenced in Paragraph 32 (and attached to the Complaint as Exhibit 1) speaks for itself, therefore, no response is required. To the extent a response is required, Tadros refers to the plain text of the Agreement and denies any characterization by Plaintiff about the nature of the obligations set out in the Agreement. Tadros denies any remaining allegations in Paragraph 32.

33. *Tadros was assigned to service, manage, and grow SP Plus's relationships and business with a substantial group of its hotel customers throughout his employment with SP Plus. Tadros served as the face of SP Plus to these customers.*

ANSWER: Tadros admits only that while employed by SP Plus in Chicago he regularly interacted with those SP Plus customers in Chicago to which he was assigned, including certain hotel locations in Chicago. Tadros denies any remaining allegations in Paragraph 33.

34. *In order for Tadros to effectively service these customers and expand business opportunities with them, he required and was given access to SP Plus's continuously updated Confidential Information pertaining to these customers, including their identities, contact information, contract terms and pricing, preferences, and other confidential information.*

ANSWER: Tadros admits only that while he was employed by SP Plus in Chicago, he had access to some of SP Plus's non-public information related to certain Chicago customers. Tadros denies the remaining allegations in Paragraph 34.

35. *As a Regional Manager I with SP Plus for over sixteen (16) years, Tadros's knowledge of confidential and highly sensitive information regarding SP Plus's operations and finances was both broad and deep. Notably, he was entrusted with access to a multitude of competitive information regarding SP Plus's customers and business strategies on a regional basis, not just the Chicago market with which he had the most customer contact and responsibility.*

ANSWER: Tadros admits only that during his entire career with SP Plus he worked only in Chicago, and that he had access to, and knowledge of, SP Plus's non-public information related to certain Chicago customers to which Tadros was assigned responsibility. Tadros denies the remaining allegations in Paragraph 35, including any attempt to broaden the scope of Tadros's professional responsibilities for SP Plus outside of Chicago.

36. *Tadros was well compensated for his work for SP Plus. In 2023, Tadros earned a base salary that was more than $139,000. In 2024, his base salary increased to approximately $144,000. His target annual bonus was more than $10,000.*

ANSWER: Tadros admits only that his gross base salary at SP Plus in 2023 was $139,000, and in 2024 was $144,000, plus a target annual performance bonus of $10,500. Tadros denies any remaining allegations in Paragraph 36.

14

**TADROS'S MISCONDUCT**

37.     *In November 2024, and after sixteen (16) years of employment with SP Plus, Tadros submitted his notice of voluntary resignation. When asked about his future plans, Tadros declined to provide SP Plus with any information about where he planned to work following his departure. His last day at SP Plus was December 6, 2024.*

ANSWER:     Tadros admits only that on Friday, November 22, 2024, he submitted his two-week notice of voluntary resignation to SP Plus after approximately 16 years of employment with SP Plus in Chicago, and that he declined at the time to share his future employment plans with SP Plus as he was not obligated to do so. Tadros further states that after submitting his notice of resignation, SP Plus informed him on the morning of Monday, November 25, 2024, that was his last day and that he was no longer permitted to work for SP Plus. Tadros denies any remaining allegations in Paragraph 37.

38.     *Meanwhile, Shevket Dardovski, a former Vice President, Regional Manager III at SP Plus, had resigned from SP Plus and joined LAZ just a few weeks before Tadros's departure. Mr. Dardovski worked closely and communicated frequently with Tadros while they were employed by SP Plus and, upon information and belief, recruited Tadros to work with him at LAZ. (Indeed, as explained below, it appears that Tadros and Mr. Dardovski also coordinated their efforts to poach SP Plus's employees current and prospective customers on behalf of LAZ, using SP Plus's Confidential Information to do so.)*

ANSWER:     Tadros admits only that prior to approximately November 2021 he had had worked with Mr. Dardovski while they were both employed at SP Plus; that Tadros and Mr. Dardovski were and remain close personal friends who communicate often; and that Mr. Dardovski resigned from SP Plus and accepted a position with LAZ Parking at approximately the end of October or early November 2024. Tadros denies that Mr. Dardovski "recruited Tadros to work with him at LAZ." In fact, as SP Plus Senior Vice President Chris Tretter has known since Tadros's resignation, Tadros decided to leave SP Plus when Tretter and others at SP Plus failed and refused to consider Tadros for promotion to fill the position vacated by Mr. Dardovski. Tadros denies choosing to join LAZ "to work with [Mr. Dardovski] at LAZ." Indeed, Tadros has not

15

worked with Mr. Dardovski since joining LAZ. Tadros also denies that he – whether in coordination with Mr. Dardovski or otherwise – has worked "to poach SP Plus's employees[,] current and prospective customers on behalf of LAZ using SP Plus's confidential information to do so." Answering further, Tadros's employment activity since joining LAZ has been directed at developing transportation business (not hospitality or commercial parking), and all Tadros's activity has been at and for prospective customers located outside of Illinois in compliance with the post-employment restrictive covenants in his SP Plus Agreement. Further, Tadros has not accessed or used any of SP Plus's confidential business information except in the course of his employment at SP Plus and for the benefit of SP Plus. Nor has Tadros been involved in soliciting or recruiting others to resign from SP Plus to join LAZ. Tadros denies any remaining allegations in Paragraph 38.

39.     *Tadros followed Mr. Dardovski and began working for LAZ shortly after departing from SP Plus in flagrant violation of his noncompete obligations under the Agreement.*

ANSWER: The allegations in Paragraph 39 contain legal conclusions to which no response is required. To the extent a response is necessary, Tadros denies that he began working for LAZ because of Mr. Dardovski, and Tadros denies that he has violated any enforceable provision of the Agreement. Tadros denies any remaining allegations in Paragraph 39.

40.     *Tadros has violated the Agreement in other ways as well.*

ANSWER:     The allegations in Paragraph 40 contain legal conclusions to which no response is required. To the extent a response is required, Tadros denies that he has violated any enforceable provision of his Agreement with SP Plus.

41.     *Specifically, upon information and belief, Tadros has reached out to at least one SP Plus customer with whom he had direct contact or responsibility and about whom he acquired trade secret or confidential information during his employment with the SP Plus, to solicit their business on behalf of LAZ.*

ANSWER:     Deny.

42.     *In particular, a long-term SP Plus customer with whom Tadros had regular, direct contact and about whom he knew confidential information, Customer A, canceled its multi-year contract with SP Plus for no apparent reason shortly after Tadros's departure This came as a complete surprise to SP Plus, as Customer A had never raised any concerns or issues with SP Plus.*

ANSWER:     Tadros objects to Plaintiff's improper substitution of the pseudonym "Customer A" for the name of the customer SP Plus alleges Tadros improperly solicited or otherwise contributed in some prohibited manner to allegedly cause the customer to cancel its contract with Plaintiff. The improper use of the pseudonym "Customer A" in the Complaint without leave of Court denies Tadros fundamental notice of the allegation against him to which he is now required to answer. Stating further, without knowing the identity (if any) of the alleged "Customer A," Tadros generally denies that he has solicited or taken any prohibited action to encourage or persuade any Chicago customer to cancel its contract with SP Plus. Without knowing the identity of "Customer A," Tadros is without sufficient knowledge to answer to respond to the remaining allegations about whether in the last twelve months of his employment with SP Plus Tadros had "regular, direct contact" or learned "confidential information" about the customer, or the circumstances involved with the cancellation of any contract with SP Plus, whether such cancellation came as a "complete surprise to SP Plus," or whether the customer "had never raised any concerns or issues with SP Plus." Answering further, on information and belief this allegation is made by Plaintiff in bad faith without any factual basis for alleging wrongdoing by Tadros and contrary to specific facts known to SP Plus that directly contradict the allegations in this Paragraph.

43.     *Although Customer A did not provide a reason for its cancellation, upon information and belief, Tadros and Mr. Dardovski were the impetus for its decision to switch to LAZ. Indeed, upon further information and belief, Mr. Dardovski was bragging at a Super Bowl party about how instrumental he and Tadros were in getting Customer A to move its business from SP Plus to LAZ.*

ANSWER:     Tadros reiterates his above objection to Plaintiff's improper substitution of the pseudonym "Customer A" for the name of the customer SP Plus alleges "Tadros and Mr. Dardovski were the impetus for its decision to switch to LAZ." Tadros denies that he has engaged

in any prohibited conduct to serve as "the impetus" for any restricted customer under his SP Plus Agreement within 75-miles of Chicago to "switch to LAZ." Tadros is without knowledge sufficient to form a belief as to the truth or falsity of the allegation about Mr. Dardovski's alleged unspecified statement(s) at a Super Bowl party, and on that basis denies the same. Tadros denies any remaining allegations in Paragraph 43.

*44.    Upon information and belief, Tadros also assisted (and is likely continuing to assist) Mr. Dardovski in soliciting the same prospective customer (Customer B) for LAZ whose business Mr. Dardovski was trying to obtain for SP Plus at the time that he left SP Plus, using the same strategy as he did on behalf of SP Plus and using SP Plus's Confidential Information. By way of background, Mr. Dardovski was trying to obtain Customer B's business for SP Plus at the time that he left SP Plus. Customer B needs approval for a loading zone from the City of Chicago before it enters into any contract for parking management services. While he was at SP Plus, Mr. Dardovski was responsible for working with a particular Chicago Alderman to assist in Customer B's efforts to obtain that approval and, based on his Facebook and LinkedIn posts, Mr. Dardovski continues to be in contact with both Customer B and the Alderman.*

ANSWER:    Tadros reiterates his objection to Plaintiff's improper substitution of the pseudonym "Customer B" for the name of an alleged prospective customer of SP Plus who Plaintiff alleges Tadros impermissibly assisted Mr. Dardovski in soliciting for LAZ. Tadros denies assisting with any impermissible solicitation of a prospective SP Plus customer located within 75-miles of Chicago. Tadros lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations pertaining to Mr. Dardovski's intentions, actions, or interactions with a Chicago Alderman, and on that basis Tadros denies the same. Tadros denies any remaining allegations in Paragraph 44.

*45.    SP Plus has learned that Tadros sent a meeting invitation with the subject of "Customer B Proposal" to Mr. Dardovski's personal email address on October 25, 2024 – just days before Mr. Dardovski submitted his notice of voluntary resignation to SP Plus. The proposed meeting time was a date in early November 2024. Upon information and belief, the purpose of this meeting set up by Tadros was to discuss the details of SP Plus's proposal to Customer B and to assist Mr. Dardovski in his efforts to hijack SP Plus's strategy for obtaining business from Customer A in order to win that business for LAZ.*

ANSWER:    Tadros reiterates his objection to Plaintiff's improper substitution of the pseudonyms "Customer B" and "Customer A" for the names of SP Plus's alleged prospective customer and customer, respectively, both of whom Plaintiff alleges Tadros impermissibly assisted Mr. Dardovski in soliciting for LAZ. Tadros denies the allegations in Paragraph 45. Answering further, on information and belief, Plaintiff makes these allegations in bad faith, having knowledge before the filing of the Complaint of uncontroverted facts that directly contradict the allegations in this paragraph.

46.    *Furthermore, upon information and belief, both Tadros and Mr. Dardovski met for dinner with several SP Plus managers who work on the sites of major SP Plus customers on or about December 4, 2024 – before Tadros had left SP Plus – for the purpose of soliciting those SP Plus employees on behalf of LAZ and laying the groundwork for future solicitation of the SP Plus customers for which those managers were responsible.*

ANSWER:    Tadros denies the allegations in Paragraph 46.

47.    *In addition to this alarming information about improper solicitation of its customers and employees, Tadros has misappropriated SP Plus's Confidential Information. SP Plus has discovered that, in the weeks leading up to Tadros's and Mr. Dardovski's resignations from SP Plus, Mr. Dardovski sent SP Plus's Confidential Information to Tadros; such information contained confidential client and pricing information. Thereafter, Tadros forwarded the information to his personal email address. Mr. Dardovski had no legitimate, SP Plus-related business reason for sending this detailed information to Tadros, as Tadros was working with another group in the Chicago market at that time and would have had no use for that type of information in his role at SP Plus. However, such information would be extremely valuable to Tadros and Mr. Dardovski in their new roles at LAZ and, in sending it to his personal email address, Tadros clearly intended to provide himself and Mr. Dardovski a head start to directly compete with SP Plus upon joining LAZ.*

ANSWER:    Tadros admits only that on October 14, 2024, while Mr. Dardovski and Tadros both worked for SP Plus, Mr. Dardovski called Tadros to say he was forwarding an email with an attached file that he wanted Tadros to print for Mr. Dardovski in preparation for an upcoming SP Plus group business call. When Tadros was unable to get the file to print from his SP Plus email, he forwarded it to his personal email account for the purpose of printing the file for Mr. Dardovski, who had said he would pick it up the next day at the SP Plus Chicago office. When Mr. Dardovski did not come into the SP Plus office the next day as planned, Tadros never opened

the forwarded file again and did not print it. Tadros did not thereafter forward the information to

Mr. Dardovski or anyone else, and Tadros has not reviewed the file since he tried to print it for

Mr. Dardovski from his SP Plus email account while they were both employed at SP Plus. Tadros

denies the remaining allegations of Paragraph 47. Stating further, on information and belief, SP

Plus makes the allegations in this paragraph in bad faith. For example, contrary to the allegations

in Paragraph 47, the document at issue that Tadros forwarded from his SP Plus email to his

personal email account to print for Mr. Dardovski contains no client pricing information at all and

SP Plus knows this.

48.     *Tadros's efforts to hide his future employment plans from SP Plus, his apparent
involvement in Customer A's decision to move its business from SP Plus to LAZ, the timing of his
scheduled meeting with Mr. Dardovski about Customer B's proposal, and his suspicious email
activity leading up to his departure, all strongly suggest that he intends to disclose and use SP Plus's
trade secret and other confidential information in his new role at LAZ, if he has not done so already.
For example, Tadros's knowledge about SP Plus's confidential contract terms, including rates and
specific services provided, could be used in tailoring proposals for services on behalf of LAZ and to
undercut SP Plus's rates.*

ANSWER:     The allegations in Paragraph 48 contain legal conclusions as to what

constitutes "trade secrets" information to which no response is required. To the extent a response

is required, Tadros denies any unauthorized use or disclosure of any SP Plus "trade secret or other

confidential information" in his employment at LAZ. Tadros denies that he engaged in any "efforts

to hide his future employment." Rather, Tadros updated his professional profile on LinkedIn and

SP Plus sent Tadros a letter dated December 6, 2024, about his new employment with LAZ. Tadros

reiterates his objection to Plaintiff's improper substitution without leave from the Court of the

pseudonyms "Customer A" and "Customer B" for the actual names of the alleged restricted SP

Plus customer and prospective customer. Answering further, Tadros denies engaging in

"suspicious email activity leading up to his departure" from SP Plus, or that any of the above

allegations "strongly suggest" an intent to disclose or use SP Plus's confidential business information in his employment at LAZ. Tadros denies any remaining allegations in Paragraph 48.

### SP PLUS REMINDS TADROS OF HIS POST-EMPLOYMENT OBLIGATIONS AND ATTEMPTS TO RESOLVE THE SITUATION WITHOUT RESORTING TO LITIGATION

*49.     On November 27, 2024 – before Tadros had even separated from SP Plus – Brett Harvey, SP Plus's Vice President, Employee/Labor Relations, sent Tadros a letter via email reminding him of the scope and importance of his post-employment obligations to SP Plus. Tadros did not respond.*

ANSWER:     Tadros admits only that he received a letter via email from Brett Harvey of SP Plus on November 27, 2024, the substance of which reminded Tadros of the post-employment obligations set forth in his SP Plus Agreement, and that he did not reply to Harvey's letter. Tadros denies the allegation in Paragraph 49 to the extent it is intended to suggest that Tadros had any obligation to respond to Harvey's letter, or that Tadros was not already separated from SP Plus as of November 27, 2024, which is after SP Plus no longer permitted Tadros to work there.

*50.     On December 6, 2024, Mr. Harvey sent Tadros a second letter via email after learning some troubling information. In particular, SP Plus informed Tadros that it had discovered that he had started working for LAZ, a direct competitor, in violation of his ongoing obligations to the Company. SP Plus also shared that it was aware that Tadros had sent SP Plus's confidential information from his SP Plus email account to his personal email account. SP Plus demanded that Tadros cease and desist all misconduct and preserve all potentially relevant documents regarding the matter. Tadros ignored SP Plus's second letter as well.*

ANSWER:     Tadros admits only that he received a second letter from Harvey at SP Plus via email on or about December 6, 2024, the contents of which speak for themselves. Tadros denies ignoring SP Plus's second letter. Stating further, although Tadros had no obligation to respond to the letter, counsel for Tadros and LAZ  discussed the substance of the second letter with Harvey and in-house legal counsel for SP Plus in December 2024, including discussing SP Plus's demand for document preservation and Tadros's request for SP Plus's direction as to how he should proceed with returning and/or permanently deleting any SP Plus documents found on Tadros's

personal mobile device or personal email account after 16 years of employment at SP Plus. SP Plus has never responded with any instructions to Tadros. Answering further, Tadros denies violating his obligations to SP Plus before or after the separation of his employment with SP Plus and denies any remaining allegations in Paragraph 50.

*51.     In a final effort to avoid litigation, SP Plus's outside counsel sent a cease-and-desist letter to Tadros on February 20, 2025 demanding that, among other things, Tadros cease performing work on behalf of LAZ, cease soliciting SP Plus customers whom he is restricted from pursuant to the terms of the Agreement, and return all of SP Plus's trade secrets and other confidential information remaining in his personal possession. SP Plus simultaneously sent a copy of the letter to LAZ to seek its cooperation in ensuring that LAZ would not place Tadros in a position to run afoul of his ongoing obligations to SP Plus in the course of his new employment.*

ANSWER:     Tadros admits only that he received a letter from SP Plus's counsel dated February 20, 2025. The contents of the letter speak for themselves, although the factual recitation in the letter by SP Plus's counsel is wildly inaccurate and includes some allegations SP Plus plainly knows to be false. Tadros denies that he ever violated any duty owed to SP Plus, and denies the February 20, 2025, letter was "a final effort" by SP Plus "to avoid litigation," instead of a further demonstration of SP Plus's bad faith in pursuing litigation.

*52.     While the February 20, 2025, letter prompted LAZ to respond on Tadros's behalf and to reportedly take steps to digitally image Tadros's personal phone and email, Tadros has not indicated any willingness to comply with SP Plus's demands that he cease working on behalf of a direct competitor in violation of the terms of his Agreement and cease soliciting SP Plus customers whom he is restricted from pursuant to the terms of the Agreement. Moreover, Tadros has not returned any SP Plus information remaining in his personal possession (even though he departed SP Plus four months ago).*

ANSWER:     Tadros denies that he has violated any obligations owed to SP Plus, and denies that he has not indicated through counsel and LAZ that he intends to continue complying with his obligations. Indeed, Tadros has made it clear to SP Plus through counsel and LAZ that his work activities at LAZ have been and are exclusively outside of Illinois in compliance with any enforceable restriction in his SP Plus Agreement. Tadros has also indicated his intent to comply with SP Plus's document preservation letter and has requested instruction from SP Plus since at

least December 2024 on how it would like Tadros to return and/or permanently delete copies of any SP Plus files that may be retained on his personal mobile device or personal email account from Tadros's prior employment. Plaintiff has refused to provide such instructions and now brings this allegation in bad faith. Tadros denies any remaining allegations in Paragraph 52.

53.    *In short, the parties have been unable to reach a resolution that adequately addresses SP Plus's concerns. Unfortunately, neither Tadros nor his new employer appear to appreciate the significant present harm and threats of further harm that his brazen and ongoing misconduct poses to SP Plus's customer relationships, its goodwill, and its trade secrets and other confidential information.*

ANSWER: Tadros denies that he has committed any misconduct or that SP Plus has suffered any harm from any improper conduct by him. Tadros denies that SP Plus has made a good faith effort to resolve the dispute prior to filing the Complaint as Tadros has offered assurances to SP Plus about his compliance and has requested instruction from SP Plus, in light of their preservation letter, as to how SP Plus would like Tadros to go about returning and/or permanently deleting any copies of SP Plus information that may be stored on his personal mobile device or his personal email account from his prior employment but SP Plus has refused to provide any instruction. Moreover, SP Plus continues to make accusations that are contrary to verifiable facts in their possession, such as the absence of client pricing information on the document referenced earlier as being forwarded to Tadros's personal email account for printing. Tadros denies any remaining allegations in Paragraph 53.

54.    *As such, SP Plus brings this matter to compensate SP Plus for the losses it has incurred due to Tadros's multiple breaches of the Agreement and misappropriation of SP Plus's trade secrets, and to enjoin Tadros from unfairly competing against SP Plus, soliciting its customers and employees, and using or disclosing any of SP Plus's trade secrets and other confidential information.*

ANSWER: Tadros denies that SP Plus is entitled to any compensation, damages or equitable relief at all, or that SP Plus has suffered any losses due to any breach by Tadros of any enforceable restriction in his SP Plus Agreement. Tadros also denies misappropriating any

confidential business information belonging to SP Plus or using or disclosing the same in connection with his current employment at LAZ, and denies soliciting any restricted SP Plus customers or employees to leave SP Plus and/or move their business or employment to LAZ. Tadros denies any remaining allegations in Paragraph 54.

## COUNT I
## BREACH OF CONTRACT

55.     *SP Plus hereby realleges and incorporates by reference the allegations of the above-numbered paragraphs as if set forth in full herein.*

ANSWER:     Paragraph 55 is an incorporation paragraph to which no response is required. To the extent a response is required, Tadros incorporates his answers to the preceding paragraphs as though fully set forth herein.

56.     *SP Plus and Tadros entered into the Agreement on October 1, 2021.*

ANSWER:     The Agreement is a written instrument that speaks for itself. To the extent a response is required, Tadros admits the allegations in Paragraph 56.

57.     *The Agreement is a valid and enforceable contract between SP Plus and Tadros, and it is supported by adequate consideration in the form of his promotion to a Regional Director I role, his continued employment with SP Plus, and access to SP Plus's trade secrets and other confidential information.*

ANSWER:     The allegations in Paragraph 57 constitute legal conclusions to which no response is required. To the extent a response is required, Tadros denies the allegations in Paragraph 58.

58.     *Tadros breached his Agreement by the above-described conduct. Specifically, Tadros agreed that for twelve (12) months following his departure from SP Plus, he would not "be employed by any entity which is in competition with the Company within a 75 mile radius of any Company offices from which Employee worked during the 12 months preceding the termination of Employee's employment with the Company." Ex. 1, § 3(c).*

ANSWER:     Tadros denies that he has breached any restriction in his SP Plus Agreement that is enforceable under Illinois law. Tadros avers further that a restriction that would prohibit

him from working in any capacity anywhere in the world for LAZ or any other company providing

parking management and related services simply because the company operates a location within

75 miles of SP Plus's Chicago office is clearly unenforceable under Illinois law.

59. *Tadros began working for SP Plus's direct competitor, LAZ, shortly after leaving SP Plus, and LAZ directly competes with SP Plus within 75 miles of the SP Plus office from which he worked during the last year of his employment with SP Plus.*

ANSWER: Tadros admits only that after departing from SP Plus, he began working for

LAZ, and that LAZ and SP Plus compete in offering similar services to customers and potential

customers in Chicago and many other markets around the country. Tadros denies that his

employment with LAZ competes with SP Plus within 75 miles of SP Plus's Chicago office, which

is the only SP Plus office at which Tadros worked for SP Plus. Further, since joining LAZ, all of

Tadros work activities have been exclusively directed at developing business opportunities outside

of Illinois, in strict compliance with any arguably enforceable non-compete restriction in his SP

Plus Agreement. Tadros denies any remaining allegations in Paragraph 59.

60. *In addition, pursuant to the terms of the Agreement, Tadros agreed that he would not "directly or indirectly... offer, provide or sell or participate in offering, providing or selling, products or services competitive with or similar to products or services offered by, developed by, designed by or distributed by the Company to any person, company or entity which was a customer or potential customer of the Company for such products or services and with which Employee had direct contact regarding such products or services at any time during the 12 months preceding the termination of Employee's employment with the Company." Ex. 1, § 3(b).*

ANSWER: The Agreement is a written instrument that speaks for itself. Tadros denies

any characterization by SP Plus as to the terms of the Agreement and, instead, Tadros refers to the

plain text of the Agreement. Tadros denies that he has violated this provision of the Agreement,

and states that all of his activities since joining LAZ have been on developing business for LAZ

with customers at locations outside of Illinois, while Tadros's16-year employment experience at

SP Plus was entirely spent working on and for customers located in Chicago.

61. *Tadros additionally agreed not to solicit certain SP Plus customers: "During Employee's employment with the Company, and for a period of 12 months thereafter, Employee will not, directly or indirectly, on behalf of Employee or any other person, company or entity, solicit or participate in soliciting any person, company or entity for products or services competitive with or similar to products or services offered by, developed by, designed by or distributed by the Company, if that person, company or entity was a customer or potential customer of the Company for such products or services with which Employee had direct contact or about which Employee learned confidential information related to such products or services at any time during the 12 months preceding the termination of Employee's employment with the Company." Ex. 1, § 3(a).*

ANSWER: The Agreement is a written instrument that speaks for itself. Tadros denies any characterization by SP Plus as to the terms of the Agreement and, instead, Tadros refers to the plain text of the Agreement. Tadros denies that he has violated this provision of the Agreement, and states that all of his activities since joining LAZ have been on developing business for LAZ with customers at locations outside of Illinois, while Tadros's 16-year employment experience at SP Plus was entirely spent working on and for customers located in Chicago.

62. *After his departure from SP Plus, Tadros began working for LAZ and, upon information and belief, has violated his duty not to solicit from client or customers with whom he had direct contact or about whom he had learned confidential information related to competitive products or services during his last 12 months of employment with the Company.*

ANSWER: Tadros admits only that after his departure from SP Plus he began working for LAZ to develop business opportunities for LAZ outside of Illinois, which opportunities do not conflict with any customers he worked with in Chicago while employed by SP Plus. Tadros denies violating any enforceable provision of his SP Plus Agreement and denies any remaining allegations in Paragraph 62.

63. *While soliciting SP Plus's customers and employees, he has further breached his Agreement with SP Plus by acquiring, inevitably using, and/or disclosing SP Plus's trade secrets and other confidential information beyond the course of his duties for SP Plus, in violation of his nondisclosure obligations. See Ex. 1, § 1.*

ANSWER: The allegations in Paragraph 63 contain legal conclusions as to what constitutes "trade secrets," to which no response is required. To the extent a response is required, Tadros denies engaging in any unauthorized use or disclosure of any non-public information

26

belonging to SP Plus outside of his former duties for SP Plus, and denies violating the referenced provision of his SP Plus Agreement. Tadros denies any remaining allegations in Paragraph 63.

64.    *Tadros has additionally breached the Agreement by failing to return the Company's Confidential Information as required, even though he departed SP Plus more than four months ago. See Ex. 1, § 2.*

ANSWER:    Tadros denies violating the Agreement as alleged. Answering further, Tadros has since at least December 2024 acknowledged SP Plus's demand that Tadros preserve all copies of SP documents stored on his personal mobile device and/or personal email account and has requested that SP Plus provide instruction for how Plaintiff wants Tadros to return and/or permanently delete the same, but SP Plus has refused to provide any such instructions. Instead, SP Plus has used its own refusal to act as the foundation for SP Plus's specious allegations that Tadros has "breached the Agreement by failing to return the Company's Confidential Information as required, even though he departed SP Plus more than four months ago."

65.    *SP Plus fully performed its material obligations under the Agreement.*

ANSWER:    The allegations in Paragraph 65 constitute conclusions of law to which no response is required. To the extent a response is required, Tadros denies that SP Plus fully performed its material obligations under the Agreement, including by its bad faith pursuit of the allegations in this Complaint.

66.    *SP Plus has clearly ascertainable rights and protectable interests in its confidential information, its customer goodwill and relationships, and its fair competitive position.*

ANSWER:    The allegations in Paragraph 66 constitute legal conclusions to which no response is required. To the extent a response is required, Tadros denies the allegations in Paragraph 66.

67.    *The Agreement, including the noncompete, customer nonsolicitation, employee nonsolicitation, and confidentiality provisions therein, is supported by adequate consideration, and is reasonably necessary and narrowly tailored to protect SP Plus's ascertainable rights and legitimate business interests.*

ANSWER: The allegations in Paragraph 67 constitute legal conclusions to which no response is required. To the extent a response is required, Tadros denies that the referenced restrictions in the Agreement are supported by adequate consideration, are reasonably necessary, and are narrowly tailored to protect SP Plus's ascertainable rights and legitimate business interests.

68. *The covenants in the Agreement do not pose an undue hardship on Tadros.*

ANSWER: The allegations in Paragraph 68 constitute legal conclusions to which no response is required. To the extent a response is required, Tadros denies that the covenants in the Agreement, as SP Plus seeks to enforce them, do not pose an undue hardship on him.

69. *The covenants in the Agreement do not violate any applicable public interest.*

ANSWER: The allegations in Paragraph 69 constitute legal conclusions to which no response is required. To the extent a response is required, Tadros denies that the covenants in the Agreement, including as SP Plus seeks to enforce them in the Complaint, do not violate any applicable public interest.

70. *As a consequence of the foregoing, SP Plus has suffered and will continue to suffer irreparable harm for which it lacks an adequate remedy at law, as well as present economic loss and other incalculable financial loss.*

ANSWER: Tadros denies that SP Plus has suffered or will suffer any damages, let alone irreparable harm for which there is no adequate remedy at law, as a consequence of any prohibited conduct by Tadros.

71. *In his Agreement, Tadros expressly agreed that an actual or threatened breach of the above obligations to SP Plus would cause irreparable damage to SP Plus and, therefore, in the event of a violation of the Agreement, in addition to other remedies which may be available, SP Plus is entitled to "temporary restraining orders and preliminary injunctions and final injunctions without the posting of a bond enjoining such breach or threatened breach." See Ex. 1, § 6.*

ANSWER: The Agreement is a written instrument that speaks for itself. Tadros denies any characterization by SP Plus as to the terms of the Agreement and, instead, refers to the terms of the Agreement itself.

72.     *Unless Tadros is enjoined from the foregoing conduct, SP Plus will be irreparably harmed by:*

a.      *Disclosure and/or use of SP Plus's trade secret information, and other confidential information that is solely the property of SP Plus; and,*

b.      *Present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable, but in no event less than $75,000 exclusive of interest and costs.*

ANSWER:     Tadros denies that SP Plus is entitled to any legal or equitable relief whatsoever, or that SP Plus has suffered any damages or irreparable harm from Tadros engaging in any prohibited conduct in violation of any enforceable restriction under Illinois law. Tadros denies any remaining allegations in the Paragraph 72.

**COUNT II**
**MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. §§ 1836, *ET SEQ.***

73.     *SP Plus hereby realleges and incorporates by reference the allegations of the above-numbered paragraphs as if set forth in full herein.*

ANSWER:     Paragraph 73 is an incorporation paragraph to which no response is required. To the extent a response is required, Tadros incorporates his answers to the preceding paragraphs as though fully set forth herein.

74.     *During the entire course of his employment with SP Plus, Tadros had access to trade secrets and other nonpublic confidential information that is of extraordinary value to SP Plus.*

ANSWER:     The allegations in Paragraph 74 contain legal conclusions as to what constitutes protectable "trade secrets" to which no response is required. To the extent a response is required to this legal conclusion, Tadros lacks information or knowledge sufficient to form a belief as to what constitutes "trade secrets" and on that basis denies the same. With respect to the factual allegations in Paragraph 74, Tadros admits only that he had access to nonpublic information of SP Plus while he was employed at SP Plus. Tadros is without knowledge or information

sufficient to form a belief as the value of that information to SP Plus and on that basis denies the same. Tadros denies any remaining allegations in Paragraph 74.

75.     As set forth above, SP Plus expended significant amounts of time and money to develop, accumulate, maintain, refine, and possess certain trade secret information, including, but not limited to, information about customers and business relationships; contract provisions; pricing; margins; business plans; marketing plans; financial data; business and customer strategy; and plans or proposals related to the foregoing. This information constitutes "trade secrets" under the DTSA.

ANSWER:     The allegations in Paragraph 75 contain legal conclusions as to what constitutes protectable "trade secret information" or what "information constitutes 'trade secrets' under the DTSA," to which no response is required. To the extent a response is required, Tadros denies the legal conclusion allegations in Paragraph 75. Tadros is without knowledge or information sufficient to form a belief as to truth or falsity as to the remaining factual allegations in Paragraph 75, and on that basis denies the same.

76.     SP Plus has made concerted efforts and reasonable steps to maintain the secrecy of its trade secrets and to prevent the unauthorized disclosure or use of its trade secret information through, among other measures, requiring employees with access to its trade secrets and other confidential information to sign agreements containing confidentiality requirements and, in many other cases, other restrictive covenants tailored to protect that information; training its employees on the importance of protecting its trade secrets and other confidential information and requiring its employees to adhere to internal policies that protect such information, including policies governing the treatment of its trade secrets and other confidential information, use of its electronic communication and information systems (including phones, computers, email, internet, and social media pages); using passwords to protect its internal data management systems containing trade secrets and other confidential information; limiting access to its trade secrets and other confidential information to those employees who need to know the information in order to perform their roles for SP Plus; employing policies and providing employee training regarding controlling access to, and maintaining the security of, its Information Technology ("IT") and electronic communications systems; and, cutting off departing employees' electronic access to SP Plus's systems at the conclusion of their last day of employment or on the day of their resignation if they disclose, or SP Plus otherwise learns, that they are going to work for a competitor.

ANSWER: The compound allegations in Paragraph 76 contain legal conclusions as to the meaning of "trade secret information" and "trade secrets and other confidential information" to which no response is required. To the extent a response is required, Tadros denies the legal conclusion allegations in Paragraph 76.  With regard to the compound factual allegations in

Paragraph 76, Tadros lacks knowledge or information sufficient to form a belief as to the processes and procedures SP Plus has in place to protect its non-public information with respect generally to "employees with access," and on that basis denies the remaining allegations in Paragraph 76.

77.     *SP Plus's trade secrets derive independent economic value and confer a competitive edge to SP Plus from not being generally known to, and not being readily ascertainable by proper means by, other companies or individuals (in SP Plus's industry or elsewhere) who could obtain an advantage from them by virtue of their not being accessible, through proper means, to competitors who could profit from their use or disclosure. SP Plus provided Tadros access to its trade secret information for the limited purpose of his use of this information during the scope of his employment for SP Plus.*

ANSWER: The allegations contained in Paragraph 77 contain legal conclusions as to what constitutes "trade secrets," to which no response is required. To the extent a response is required, Tadros denies the legal conclusion allegations in Paragraph 77. With regard to the remaining factual allegations in Paragraph 77, Tadros admits only that during his employment with SP Plus he had access to non-public information belonging to SP Plus, which Tadros used only during the scope of his employment for SP Plus. Tadros lacks sufficient information or knowledge to form a belief as to the truth or falsity of the remaining factual allegations in Paragraph 77, and on that basis denies the same.

78.     *These trade secrets are used in interstate commerce by SP Plus in its businesses within the United States.*

ANSWER:     The allegations contained in Paragraph 78 contain legal conclusions as to what constitutes "trade secrets" to which no response is required. To the extent a response is required, Tadros lacks sufficient information or knowledge as to what constitutes legally protectable "trade secrets," and on that basis Tadros denies the legal conclusion allegations in Paragraph 78. Tadros also objects to Paragraphs 78 as vague in that it is not clear what alleged "trade secrets" are being referred to in the Paragraph as being used in interstate commerce within the United States. As such, Tadros lacks information or knowledge to form a belief as to the truth

or falsity of these allegations in Paragraph 78, and on that basis Tadros admits only that SP Plus engages in business in a number of different states within the United States, although Tadros only worked for SP Plus in Chicago. Tadros denies any remaining allegations in Paragraph 78.

79.     *Tadros acquired SP Plus's trade secret information by improper means when he abused his access to such information and transferred it to his personal email account for no legitimate (SP Plus-related) business purpose, violated the confidentiality provisions within the Agreement, violated various SP Plus policies, wrongfully misappropriated, and then retained such information following the termination of his employment with SP Plus.*

ANSWER:     The allegations in Paragraph 79 contain legal conclusions as to what constitutes "trade secret information," what constitutes violations Tadros's Agreement with SP Plus or SP Plus's policies, or what constitutes "wrongfully misappropriated" information to which no response is required. To the extent a response is required, Tadros denies these legal conclusory allegations. As to the factual allegations in Paragraph 79, Tadros denies improperly acquiring, transferring, or abusing his access to SP Plus's information during or after his employment with SP Plus. Stating further, Tadros has asked SP Plus since at least December 2024 to provide him with instructions on how SP Plus would like returned or destroyed any information that may be stored on Tadros's personal email account from and in the course of Tadros's employment at SP Plus, which file or information Tadros has not accessed since leaving SP Plus. SP Plus has not provided Tadros with any direction on returning or destroying the information or file, but, rather, has only demanded that Tadros preserve it, which Tadros has done. SP Plus is fully aware the limited information forwarded to Tadros's personal email account during his employment at SP Plus is not as described and alleged by SP Plus, and SP Plus is pursuing these allegations of misappropriation in bad faith.

80.     *Tadros's misappropriation of SP Plus's trade secrets has been willful and malicious in that he was aware of his contractual obligations to maintain the confidentiality of SP Plus's trade secrets, yet he violated those obligations when he obtained and transferred them to his personal email account. As further evidence that his misappropriation was willful and malicious, Tadros lied about his future employment plans with LAZ to avoid detection by SP Plus.*

ANSWER: The allegations in Paragraph 80 contain legal conclusions to what constitutes "willful and malicious" "misappropriation of SP Plus's trade secrets," and whether actions "violated" Tadros's obligations, to which no response is required. To the extent a response is required to these legal conclusion allegations, Tadros denies them. Tadros also denies misappropriating any non-public SP Plus information of commercial value, denies using or disclosing such information or property of SP Plus on his personal email for any unauthorized purpose. Stating further, Tadros denies lying about his future employment plans with LAZ, denies any obligation to disclose his future employment plans to SP Plus, and denies that not sharing his future employment plans with SP Plus is probative of anything. Tadros denies any remaining allegations in Paragraph 80 and avers further that that Plaintiff makes these allegations in bad faith.

81. *Tadros's misconduct was not only a violation of the Agreement and common law, but also constitutes a willful and malicious misappropriation of SP Plus's trade secrets in violation of the DTSA.*

ANSWER: The allegations contained in Paragraph 81 constitute legal conclusions to which no response is required. To the extent a response is required, Tadros denies the allegations in Paragraph 81 and avers that Plaintiff makes these allegations in bad faith.

82. *Unless enjoined by this Court, Tadros's misappropriation of SP Plus's trade secrets will cause significant irreparable harm to SP Plus, and SP Plus has no adequate or other remedy at law for such acts and threatened acts. As such, SP Plus is entitled to injunctive relief.*

ANSWER: The allegations contained in Paragraph 82 constitute legal conclusions to which no response is required. To the extent a response is required, Tadros denies the allegations in Paragraph 82 and avers that Plaintiff makes these allegations in bad faith.

83. *As a direct, proximate, and foreseeable result of Tadros's misappropriation of SP Plus's trade secrets, SP Plus has also been monetarily damaged in an amount to be determined at trial.*

ANSWER: The allegations in Paragraph 83 contain legal conclusions to which no response is required. To the extent a response is required, Tadros denies the legal conclusion

allegations in Paragraph 83. As to the factual allegations in Paragraph 83, Tadros denies misappropriating SP Plus's confidential business information, or that he used such information outside of the course of his employment with SP Plus, or that SP Plus has been monetarily damaged by any prohibited conduct committed by Tadros. Answering further, Tadros avers that SP Plus makes these allegations in bad faith.

**COUNT III**
**MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE**
**ILLINOIS TRADE SECRETS ACT, 765 ILCS 1065/1, *ET SEQ.***

84. *SP Plus hereby realleges and incorporates by reference the allegations of the above-numbered paragraphs as if set forth in full herein.*

ANSWER: Paragraph 84 is an incorporation paragraph to which no response is required. To the extent a response is required, Tadros incorporates his answers to the preceding paragraphs as though fully set forth herein.

85. *At all relevant times, the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1, et seq., was in effect.*

ANSWER: The allegations contained in Paragraph 85 constitute legal conclusions to which no response is required. To the extent a response is required, Tadros admits the ITSA has been in effect at all times since at least 2021, when Tadros signed his SP Plus Agreement (Exhibit 1 to the Complaint).

86. *SP Plus owned and developed trade secrets as defined by 765 ILCS 1065/2(d).*

ANSWER: The allegations contained in Paragraph 86 constitute legal conclusions to which no response is required. To the extent a response is required, Tadros objects to the vagueness of Paragraph 86 as it is not clear what information owned and developed by SP Plus is being alleged to constitute "trade secrets as defined by 765 ILSS 1065/2(d)." Based on this vagueness, Tadros denies the allegations in Paragraph 86.

87.     *SP Plus's confidential information described above constitutes trade secrets because SP Plus derives independent economic value and a competitive edge from that information not being generally known to the public and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and because the information was the subject of reasonable efforts to maintain its secrecy.*

ANSWER:     The allegations contained in Paragraph 87 constitute legal conclusions to which no response is required. To the extent a response is required, Tadros objects to the vagueness of Paragraph 87 as it is not clear what "confidential information" is being alleged to constitute trade secrets. Based on this vagueness, and lacking information or knowledge sufficient to form a belief as to the truth or falsity of SP Plus's claimed "economic value and competitive edge" derived from such unspecified information, or SP Plus's "reasonable efforts to maintain its secrecy," Tadros denies the allegations in Paragraph 87.

88.     *SP Plus invested substantial time, money, and effort to develop, accumulate, maintain, refine, its trade secret information. SP Plus has made concerted efforts and taken reasonable steps to maintain the secrecy of its trade secrets and to prevent the unauthorized disclosure or use of its trade secret information. As described in greater detail above, SP Plus, among other things, maintains its trade secret information on password-protected computers, limits access to the information, mandates that employees follow its confidentiality policies, and requires employees to sign agreements containing confidentiality requirements and, in many other cases, other restrictive covenants tailored to protect that information.*

ANSWER:     The allegations in Paragraph 88 contain legal conclusions as to what is "trade secret information" to which no response is required. To the extent a response is required, Tadros denies the legal conclusion allegations in Paragraph 88. With regard to the factual allegations, Tadros lacks sufficient information or knowledge as to SP Plus's investments of "time, money and effort to develop, accumulate, maintain, [and] refine" its non-public business information, or SP Plus's alleged "steps to maintain the secrecy" or "prevent the unauthorized disclosure or use" of such information, and on this basis Tadros denies the remaining allegations in Paragraph 88.

89.     *Pursuant to 765 ILCS 1065/2, a person who misappropriates the trade secret of another person by improper means or discloses the trade secret without the express or implied*

*consent of the person or who used improper means to acquire the knowledge of the trade secret(s) violates the ITSA.*

ANSWER: The allegations contained in Paragraph 89 constitute legal conclusions to which no response is required. To the extent a response is required, Tadros avers that 765 ILCS 1065/2 speaks for itself. Answering further, Tadros denies any remaining express or implied allegation that Defendant has misappropriated any of SP Plus's non-public information having economic value and then improperly used or disclosed the same.

90. *The above-alleged facts constitute threatened misappropriation of trade secrets by Tadros pursuant to the ITSA, and applicable common law.*

ANSWER: The allegations contained in Paragraph 90 constitute legal conclusions to which no response is required. To the extent a response is required, Tadros denies the allegations in Paragraph 90.

91. *Tadros's knowledge of SP Plus's trade secret information was acquired under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty Tadros owed SP Plus both contractually and as an employee of SP Plus.*

ANSWER: The allegations in Paragraph 91 contain legal conclusions, as to what constitutes "trade secret information" and whether a legal "duty" exists, to which no response is required. To the extent a response is required, Tadros denies the legal conclusion allegations in Paragraph 91. With respect to the factual allegations, Tadros admits only that during his employment with SP Plus he was exposed to certain non-public business information, which he has not used or disclosed since leaving SP Plus. Tadros denies any remaining allegations in Paragraph 91.

92. *Tadros made improper use of SP Plus's trade secret information when he transferred it to his personal email account for no legitimate (SP Plus-related) business purpose.*

ANSWER: The allegations in Paragraph 92 contain legal conclusions as to what constitutes "improper use" and what is "trade secret information," to which no response is

required. To the extent a response is required, Tadros denies the legal conclusions alleged in Paragraph 92. Tadros also denies that he transferred SP Plus's non-public information to his personal email account "for no legitimate (SP Plus-related) business purpose." Answering further, Tadros avers that SP Plus makes these allegations in bad faith.

93. *Tadros's misappropriation of SP Plus's trade secrets has been willful and malicious in that he was aware of his contractual obligations to maintain the confidentiality of SP Plus's trade secrets, yet he violated those obligations when he obtained and transferred them to his personal email account. As further evidence that his misappropriation was willful and malicious, Tadros lied about his future employment plans with LAZ to avoid detection by SP Plus.*

ANSWER: The allegations in Paragraph 93 contain legal conclusions as to what constitutes "trade secrets" and "willful and malicious" misappropriation for purposes of the ITSA to which no response is required. To the extent a response is required, Tadros denies these legal conclusions alleged in Paragraph 93. With regard to the factual allegations in Paragraph 93, Tadros admits only that he is aware of his contractual obligations to maintain confidentiality of SP Plus's non-public business information. Tadros denies that he has violated those obligations during or after his employment with SP Plus, including denying that during his employment with SP Plus he transferred non-public information from his SP Plus email account to his personal email account for any improper, non-SP Plus related business purpose. Tadros also denies that he "lied about his future employment plans with LAZ," denies that he had any obligation to disclose his future employment plans with LAZ, and denies that declining to share his future employment plans with SP Plus is probative of any alleged malicious intent. Tadros denies any remaining allegations in Paragraph 93 and avers further that Plaintiff makes the allegations in Paragraph 93 in bad faith.

94. *Tadros will be unjustly enriched by the misappropriation of SP Plus's trade secrets, and unless restrained, will continue to use, divulge, and otherwise misappropriate SP Plus's trade secrets.*

ANSWER: The allegations in Paragraph 94 contain legal conclusions as to the definitions of "trade secrets" and unjust enrichment to which no response is required. To the extent

a response is required, Tadros denies these legal conclusion allegations in Paragraph 94.

Answering further, Tadros denies engaging in any misappropriation or unauthorized use or

disclosure of SP Plus's information or being enriched by any such conduct. Tadros also avers that

Plaintiff makes and is pursuing these allegations in bad faith.

95.     *SP Plus has been injured, irreparably and otherwise, and is threatened with additional and ongoing injuries as a result of Tadros's misappropriation of trade secrets Tadros has used or disclosed and may continue to use or disclose SP Plus's trade secrets and confidential and proprietary information, in violation of Illinois law and his duties to SP Plus. This disclosure and use have and will continue to wrongfully benefit Tadros and LAZ to the detriment of SP Plus. Tadros's unauthorized, wrongful, and tortious conduct has directly and proximately caused great and irreparable injury to SP Plus which cannot be adequately measured or compensated by money damages.*

ANSWER:     The allegations in Paragraph 95 contain legal conclusions as to what

constitutes irreparable injury and trade secrets for purposes of the ITSA, to which no response is

required. To the extent a response is required, Tadros denies the legal conclusion allegations in

Paragraph 95. Answering further, Tadros denies that SP Plus has been unfairly injured, or is

threatened with unfair injury as a result of any misappropriation or unauthorized use or disclosure

of SP Plus's non-public information by Tadros. Defendant also avers that Plaintiff's allegation in

Paragraph 95 that his conduct "has directly and proximately caused great and irreparable injury to

SP Plus" is made in bad faith.

96.     *SP Plus has no adequate remedy at law and is entitled to equitable and injunctive relief.*

ANSWER:     The allegations contained in Paragraph 96 constitute legal conclusions to

which no response is required. To the extent a response is required, Tadros denies that Plaintiff

has no adequate remedy at law and denies that Plaintiff is entitled to any remedy or relief at all.

97.     *SP Plus has suffered damages as a result of these actions in an amount to be determined at trial, and because its remedy at law is inadequate, SP Plus seeks injunctive relief to protect its trade secret information, its goodwill and other legitimate business interests. SP Plus also seeks to recover from Tadros any gains, profits and advantages obtained as a result of the wrongful*

*acts alleged herein in an amount to be determined and an award of exemplary damages and attorneys' fees as permitted by law.*

ANSWER: The allegations in Paragraph 97 contain legal conclusions as to the adequacy of any available remedy at law and a request for equitable relief to which no responses is required. To the extent a response is required, Tadros denies that Plaintiff has no adequate remedy at law or that Plaintiff is entitled to any remedy or relief whatsoever. Tadros also denies that SP Plus has suffered any damages as a result of any prohibited conduct by him, or that Tadros has been unfairly enriched as a result of any wrongful acts. On this basis, Defendant denies the factual allegations in Paragraph 97. Answering further, Tadros avers that Plaintiff's allegation that it has "suffered" unfair damages as result of any prohibited conduct by Tadros, and Plaintiff's asserted claims for "exemplary damages and attorneys' fees" are made in bad faith.

## JURY DEMAND

*SP Plus demands a trial by jury on all issues and causes of action so triable.*

ANSWER: The allegations contained in this Paragraph constitute a legal demand to which no response is required. To the extent a response is required, Tadros also demands a jury trial on those issues and causes of action so triable.

## ATTORNEYS' FEES AND COSTS

*SP Plus seeks reasonable attorneys' fees and costs against Tadros under the DTSA and ITSA.*

ANSWER: The allegations contained in this paragraph constitute a legal request for relief to which no response is required. To the extent a response is required, Tadros denies SP Plus is entitled to any relief, including attorneys' fees and costs. Further, Tadros avers that he is entitled under the DTSA and ITSA to recover attorneys' fees and costs as Plaintiff's claims of misappropriation of trade secrets by Tadros are meritless and are being pursued in bad faith.

WHEREFORE, Defendant Jeries Tadros respectfully requests that this Honorable Court enter judgment in his favor and against Plaintiff SP Plus by dismissing Plaintiff's Complaint with prejudice, and awarding Defendant his reasonable attorneys' fees and costs, and whatever other relief which the Court finds to be just and proper.

## **AFFIRMATIVE DEFENSES**

1.      The Complaint, in whole or in part, fails to state a claim upon which relief can be granted.

2.      Plaintiff's Agreement with respect to post-employment restrictions is unenforceable due to lack of adequate consideration.

3.      Plaintiff's Agreement with Tadros is, in whole or in part, unenforceable under Illinois law due to the overly broad scope of the post-employment restrictions and/or their duration being longer than is necessary to protect Plaintiff's legitimate, protectable business interests.

4.      Plaintiff's claims are barred, in whole or in part, due to Plaintiff's failure to take adequate steps to protect the secrecy of information it claims to constitute "trade secrets."

5.      Plaintiff's claims are barred, in whole or in part, by estoppel.

6.      Plaintiff's actions were the proximate cause of any injuries, damages, or business losses that Plaintiff claims to or may have suffered.

7.      Plaintiff's claims are barred, in whole or in part, by Plaintiff's own unclean hands.

Dated: July 29, 2025                    Respectfully submitted,

*/s/ Carolyn O. Boucek*
Michael S. Ferrell (ARDC 6277458)
Carolyn O. Boucek (ARDC 6346817)
Epstein Becker Green, P.C.
227 W. Monroe Street, Suite 4500
Chicago, IL  60606
mferrell@ebglaw.com
cboucek@ebglaw.com
*Counsel for Defendant Jeries Tadros*

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that a true and correct copy of the foregoing was served on all counsel of record via ECF on the date of filing as follows:

Timothy D. Elliott
Raymond J. Sanguinetti
RATHJE WOODWARD LLC
300 E. Roosevelt Road, Suite 220
Wheaton, Illinois 30187
telliott@rathjelaw.com
rsanguinetti@rathjelaw.com

Stephen D. Riden
BECK REED RIDEN, LLC
155 Federal Street, Suite 1302
Boston, Massachusetts 02110
sriden@beckreed.com

*Counsel for Plaintiff*

*/s/ Carolyn O. Boucek*
Carolyn O. Boucek
*Counsel for Defendant Jeries Tadros*